1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CELLSPIN SOFT, INC.,

       Plaintiff,

    vs.

FITBIT, INC.,

-----------------------------------------------

NIKE, INC.,

-----------------------------------------------

UNDER ARMOUR, INC.,

-----------------------------------------------

FOSSIL GROUP, ET AL.,

-----------------------------------------------

GARMIN INTERNATIONAL, INC.,

-----------------------------------------------

NIKON AMERICAS, INC., ET AL.,

      Defendants.

SUMMARY JUDGMENT ORDERS
**REDACTED VERSION**

Case No. 4:17-CV-05928-YGR

Case No. 4:17-CV-05931-YGR

Case No. 4:17-CV-05932-YGR

Case No. 4:17-CV-05933-YGR

Case No. 4:17-CV-05934-YGR

Case No. 4:17-CV-05936-YGR

      Plaintiff Cellspin Soft, Inc. brings individual patent infringement actions against Defendants Fitbit, Inc., Nike, Inc., Under Armour, Inc., Fossil Group, Garmin International, Inc., and Nikon Americas, Inc.[1]  Cellspin accuses each of the six defendant's products of infringing U.S. Patent Nos. 8,738,794 (the "'794 patent"), 8,892,752 (the "'752 patent"), and 9,749,847 (the "'847 patent").  These related patents recite methods and systems for the automated distribution of multimedia content (*e.g.*, publishing a photo on social media).  Each defendant now files motions

---

[1] A seventh action has been stayed pending resolution of the first six.  *See Cellspin Soft, Inc. v. Moov Inc.*, No. 4:17-CV-05929-YGR, Dkt. No. 182 (N.D. Cal. Oct. 14, 2021).

for summary judgment of non-infringement, as well as motions to seal and motions to exclude certain expert testimony. Because Cellspin responds to each summary judgment motion in similar – in some cases, identical – ways, the Court analyzes the motions together in one order and cross-references commonly briefed issues where appropriate. *See infra* pp. 4-24 (Fitbit), 25-37 (Nike), 38-46 (Under Armour), 47-60 (Fossil), 61-72 (Garmin), and 73-81 (Nikon).

At the outset, the Court concludes that Cellspin fails to marshal the evidence necessary to defeat the defendants' summary judgment motions. This is perhaps a consequence of Cellspin's decision to litigate this case with numerous defendants and accused products. While this choice was Cellspin's right, doing so did not change Cellspin's burden of proof. However, it is too late now to speculate whether a different tactic would have led to a different outcome.

Each of Cellspin's responses to the summary judgment motions fails for lack of genuine dispute of material fact. Cellspin's citations to swaths of documents without explanation does not create a genuine dispute of material fact. Nor does Cellspin's reliance upon its lengthy expert reports short in analysis or explanation for how they reach their conclusions. In particular, the Court has analyzed the bases underlying its expert Rahul Vijh's opinions and finds them conclusory and lacking substance. The reports contain much repetition and mimic much of Cellspin's contentions (hence the length), and, ultimately, do not carry evidentiary weight.

For the reasons explained below, the Court grants the summary judgment motions and denies as moot the pending motions to exclude certain expert testimony. The sealing motions will be addressed by separate order.

## I.    BACKGROUND

Cellspin brings patent infringement actions against defendants in six separate actions, accusing their products of infringing claims 1 (independent), 2-4, 7, 9, 16 (independent), 17, 18, and 20-21 of the '794 patent, claims 1 (independent), 2, 4-5, 12 (independent), 13, and 14 of the '752 patent, and claims 1 (independent), 2, and 3 of the '847 patent.

## II.    STANDARD OF REVIEW

The parties are well-acquainted with the summary judgment standard and guiding principles. The Court mentions some particularly apt here. When faced with summary judgment,

United States District Court
Northern District of California

the non-moving party is obligated "to identify with reasonable particularity the evidence that precludes summary judgment."  *See, e.g.*, *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (district court is not obligated "to scour the record in search of a genuine issue of triable fact"); *see also OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 797 (Fed. Cir. 2012) ("Where, as here, the record is devoid of meaningful analysis, we will not conduct such an analysis in the first instance.").

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

Finally, "[c]onclusory allegations and attorney arguments are insufficient to overcome a motion for summary judgment."  *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) (citing *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001)); *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed. Cir. 1995) ("There must be sufficient substance, other than attorney argument, to show that the issue requires trial.").

//

//

//

//

//

//

//

//

//

## III.   DISCUSSION

### A.   *Cellspin Soft, Inc. v. Fitbit LLC* (17-5928)

Cellspin accuses 24 Fitbit products of infringing the asserted patents.  Cellspin and its expert Rahul Vijh analyze Fitbit's Versa 2 and Charge 3 as representative of the other 22 accused products.  Fitbit moves for summary judgment of non-infringement.  *See* Dkt. No. 277.[2]

#### 1.   *Asserted Claims*

##### a.   <u>*Required Order of the Asserted Method Claims*[3]</u>

The Court construed the terms of the '752 and '794 method patents so the recited elements must be performed in the order they appear in the claims.[4]  *See* Dkt. No. 186 at 9-10.  Thus, to prove infringement Cellspin must show performance of each step of the asserted method claims in required order.  *See E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (affirming summary judgment of non-infringement where patentee lacked proof that all claimed method steps were performed in order).

Cellspin fails to offers evidence raising a genuine dispute of material fact that the accused products perform the claim elements in required order.[5]  For example, the Court's construction requires claimed "event notifications" enabled after "acquiring new data in the Bluetooth enabled data capture device" and before "determining existence of the new data for transfer."  '752 patent at 11:63-12:4 (claim 1); *id.* at 14:11-15 (claim 12 similarly recites "enabling event notification *listening* on the Bluetooth enabled mobile device" (emphasis supplied)).  Yet Cellspin provides no

---

[2] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Fitbit LLC*, No. 4:17-CV-5928 (N.D. Cal.).

[3] This is the same issue contested in *Garmin.  See infra* Section III.E.3.a.

[4] The Court's construction set out the following exceptions not at issue here:  (1) "providing a software module" in the '794 Patent can occur in any order before the "detecting and signaling" step; (2) sending a "data signal" in claim 1 of the '794 Patent can occur simultaneously with transferring new data.  Dkt. No. 186 at 9-10.

[5] Fitbit argues that "Cellspin does not explain why any device would wait until that movement in the series of method steps to enable the claimed event notifications (as opposed to, for example, keeping event notifications enabled all the time)."  Dkt. No. 277 at 10.  Cellspin rightfully notes in response:  "an explanation of the reasons why the Accused Devices are designed to perform the recited steps in order is not required of Cellspin."  Dkt. No. 297 at 10.

United States District Court
Northern District of California

1    evidence demonstrating that Fitbit's accused products function in the required order.  Instead,

2    Cellspin points to the portion of Vijh's report stating that:

3           the message to enable event notifications is received at the Accused
            Instrumentalities after pairing and after the Accused Instrumentalities
4           initiate the data acquisition process.

5    Dkt. No. 276-2 (Vijh Expert Report) ¶ 134.  Vijh's conclusory assertion does not explain the basis

6    for his opinion that Fitbit's products performed the claimed method steps in the necessary order.

7    The report cites the "discussion above concerning Elements 1.I.c to 1.I.c.i.A of Claim 1 of the

8    '752 Patent," which refers to Bluetooth "sniffing logs" and two Fitbit source code excerpts related

9    to updating data and receiving notifications.  *Id.* ¶¶ 115-17 ("data capture device code indicating

10   that the software should 'Only update live data if we are authenticated and activity service is

11   subscribed to'" and "mobile device software . . . demonstrat[ing] subscribing . . . to receive

12   notifications of changes to the characteristics on the data capture").  Vijh offers no explanation

13   how they indicate performance of the claimed steps, much less performance in order – for

14   example, enabling event notifications only after receiving messages from a mobile device instead

15   of enabling them all the time.  *See Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP*, 15 F.4th

16   1121, 1133 (Fed. Cir. 2021) (affirming district court grant of summary judgment of non-

17   infringement where patentee "cited swaths of documents . . . [b]ut failed to . . . explain how those

18   documents support its infringement theory").

19          Cellspin also cites seven other paragraphs from Vijh's report, Dkt. No. 276-2 (Vijh Expert

20   Report) ¶¶ 59, 94, 99, 123, 151, 172, 206, Cellspin's infringement contentions, Dkt. No. 277, and

21   a fully-redacted technical document, Dkt. No. 297-3.  Again, despite the breadth of the citations,

22   none of Cellspin's evidence actually shows Fitbit products practicing the asserted claims in order.

23   Paragraph 59 does not refer to anything in the record.  The remaining paragraphs (94, 99, 123,

24   151, 172, and 206) cite to source code without any explanation from which a reasonable juror can

25   conclude that each of the recited steps was performed in order.  "Nowhere do the [offered

26   evidence] teach all of the steps of the claimed method together, much less in the required order.

27   Accordingly, it requires too speculative a leap to conclude that [Fitbit] actually performed the

28   claimed method."  *E-Pass*, 473 F.3d at 1222.

United States District Court
Northern District of California

5

1    Cellspin does not offer sufficient evidence from which a reasonable juror can conclude that

2    Fitbit's accused products perform the claimed functions in the required order.  *See Novartis Corp.*

3    *v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) (affirming summary judgment of

4    non-infringement because patentee did not meet "obligation to set forth the detailed basis of its

5    evidence such that the district court could evaluate whether it could support a finding of

6    infringement" (citation omitted)).  The Court grants Fitbit's motion as to this ground.

7                    b.    *Performance in the United States*[6]

8    Because direct infringement is only applicable to infringement occurring within the United

9    States, use of a method claim does not give rise to infringement unless each step of the claimed

10   method is performed within the United States.  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d

11   1282, 1313, 1318 (Fed. Cir. 2005); *see also Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d

12   1057, 1067 (C.D. Cal. 2009) ("The use of a process only constitutes infringement of a patented

13   claim if 'all steps or stages of the claimed process' are performed in the United States." (quoting

14   *NTP, Inc.*, 418 F.3d at 1318)).

15   Fitbit moves for summary judgment of non-infringement on claims 1 and 16 of the '794

16   patent which both recite "providing a software module on the Bluetooth enabled data capture

17   device." '794 patent at 11:52-53 (claim 1); *id.* at 14:17-18 (claim 16).  Fitbit contends that its

18   accused products do not infringe this limitation.  Fitbit cites to Cellspin's own expert report that "it

19   is obvious and necessarily true that the Accused Instrumentalities are each provided with a

20   software module *at the time* they are manufactured and shipped to consumers by the Defendant."

21   Dkt. No. 276-2 (Vijh Expert Report) ¶ 166 (emphasis supplied).  Given Vijh's opinion that

22   performance occurs when a product is manufactured, Fitbit cannot infringe because it performs –

23   manufactures – its products outside of the United States.

24   Cellspin argues that "providing" is a question for the jury.[7]  Cellspin offers three theories

25   for infringing "providing," namely that Fitbit's:  (1) software performs the limitation, (2) end users

26

27   _____

     [6] This is the same issue contested in *Garmin*, *see infra* Section III.E.1.a.i, and *Nikon*, *see
     infra* Section III.F.2.a.

28   [7] The parties did not dispute this term at claim construction.

United States District Court
Northern District of California

perform the limitation when they "assemble and use the infringing system as instructed;" and (3) technology team in the United States itself performs the limitation.  Dkt. No. 297 at 11-13.

At their core, Cellspin's theories dispute the plain and ordinary meaning of "providing." "A good faith dispute about the meaning and scope of asserted claims does not, in and of itself, create a genuine dispute to preclude summary judgment in patent cases." *See Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1463 (Fed. Cir. 1998) ("Disputes concerning the meaning of claims do not preclude summary judgment, because the resolution of those disputes is part of the process of claim interpretation, a question of law.").

When considering disputes over claim scope at the summary judgment stage, courts in this district "'carefully consider' these disputes, but . . . as 'part of the infringement analysis, not part of the claim construction." *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014) (quoting *Thorner v. Sony Computer Entertainment Am.*, LLC, 669 F.3d 1362, 1369 (Fed. Cir. 2012)); *see Thorner*, 669 F.3d at 1369 (noting that issues related to the scope of claim language that are not limited by the claims or specification are "part of the infringement analysis, not part of the claim construction"); *see also Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 948 (N.D. Cal. 2018).  Under this approach, "the Court will view the parties' disputes through the lens of whether a reasonable jury, armed with the Court's claim construction as to certain terms and an instruction that the plain and ordinary meaning controls as to others, could or would necessarily conclude that the asserted claim reads on an accused device (or that a prior art reference reads on an asserted claim)." *Apple, Inc.*, 2014 WL 252045, at *5; *see also Thorner*, 669 F.3d at 1369 ("The district court is of course free on summary judgment to decide that there is no genuine issue of material fact that the accused products in this case do not meet the plain and ordinary meaning of the [disputed] term").

Upon analyzing each of Cellspin's three theories below, the Court finds that Cellspin does not persuade that a reasonable jury could conclude that Fitbit's accused products perform the "providing" act claimed by the '794 patent.

First, with respect to the argument that Fitbit's *software performs* the claimed "providing," Cellspin argues:

1
2
3

> the claimed methods are carried out and performed entirely by Fitbit's software in the Accused Devices and Mobile Applications . . . (i) at the point of sale and delivery to the consumer, and/or (ii) by virtue of software updates to devices in the United States

4   Dkt. No. 297 at 12.  By definition, this theory requires an interpretation that Fitbit's software itself

5   "provid[es] a *software* module."  Not only is this interpretation – software provides itself –

6   counter-intuitive, but it contradicts Cellspin's own expert testimony that "it is obvious and

7   necessarily true that the Accused Instrumentalities are each provided with a software module *at*

8   *the time* they are manufactured and shipped to consumers by the Defendant."  Dkt. No. 276-2

9   (Vijh Expert Report) ¶ 166 (emphasis supplied).  As is shown throughout this Order, Cellspin

10  supports its theory with "evidence" that, upon inspection, does not actually support the theory.

11  Here, the "evidence" – financial spreadsheets and deposition testimony from both Fitbit's 30(b)(6)

12  witness and Cellspin's expert – does nothing to rebut Cellspin's own expert's conclusion that

13  manufacture is the performed "providing," let alone explain how Fitbit performs the recited

14  "providing" through sales or software updates.  Neither the plain language of the asserted patent

15  claims nor Cellspin's evidence support the theory that Fitbit's software performs the "providing"

16  step.  This theory thus does not provide a basis upon which summary judgment should be denied.

17       Second, with respect to the argument that Fitbit's *end users perform* the claimed

18  "providing" when they "assemble and use the infringing system as instructed," this argument is

19  likewise contradicted by Cellspin's expert testimony.  Vijh opines that "the Accused

20  Instrumentalities are each provided with a software module at the time they are manufactured and

21  shipped to consumers by the Defendant."  Dkt. No. 276-2 (Vijh Expert Report) ¶ 166; *see also*

22  Dkt. No. 298-6 (Vijh Depo. Tr.) at 188:6-8 ("The user is involved while he is using the watch and

23  using the mobile device.  But the actual steps are being performed by the mobile application

24  and/or the firmware that is resident on the watch.").  Cellspin concedes this in its opposition brief.

25  Dkt. No. 297 at 12 ("Mr. Vijh has opined that all method steps are directly performed by Fitbit's

26  software.").  As Fitbit argues and the Court agrees, "Cellspin cannot argue on one hand that no

27  user action is required to perform the steps and on the other hand that consumer users perform

28  every step."  *Compare* Dkt. No. 297 at 12 ("The evidence of record supports the conclusion that

United States District Court
Northern District of California

1    when the Accused Instrumentalities are in use, the claimed methods are carried out and performed

2    entirely by Fitbit's software in the Accused Devices and Mobile Applications.") *with id.* at 13

3    ("Cellspin alleges that all steps of the claimed methods are performed by consumer users of

4    Fitbit's devices in the United States when they assemble and use the infringing system as

5    instructed by Fitbit."). Like Cellspin's first theory, the plain language of the asserted patent

6    claims does not support Cellspin's second theory that Fitbit performs the claimed "providing" step

7    when its consumers "assemble and use the infringing system as instructed." Summary judgment

8    cannot be denied on this basis.

9          Third, with respect to Cellspin's argument that the Fitbit *technology team performs* the

10   claimed "providing" when it provides the software module to the manufacturer, the record

11   evidence does not support the theory. Dkt. No. 297 at 15. Cellspin cites (i) the deposition

12   testimony of a Fitbit software engineer, Dkt. No. 298-5; and (ii) Fitbit's FY2015 10-K submitted

13   to the United States Securities and Exchange Commission, Dkt. No. 277-21. However, the Fitbit

14   engineer only testifies that he works at Fitbit on its technology products team implementing

15   "software stacks." Dkt. No. 298-5 at 7:12-14, 8:12-20, 12:23-13:14. There is no testimony

16   supporting Cellspin's contention that Fitbit's United States-based technology team supplies "the

17   final product to its manufacturer." Cellspin's reliance on Fitbit's FY2015 10-K fares no better.

18   The cited reference merely notes that Fitbit "outsource the manufacturing of our products to

19   several contract manufacturers, . . . [which] produce our products in their facilities located in

20   Asia." Dkt. No. 277-21 at 17. It does not create a genuine dispute of material fact for

21   infringement of the recited limitations. *See Traxcell*, 15 F.4th at 1133 (affirming grant of

22   summary judgment of non-infringement where patent owner "cited swaths of documents" but

23   "failed to link those documents to the [accused product] or to explain how those documents

24   support its infringement theory").

25         Because neither the plain language of the asserted patent claims nor Cellspin's evidence

26   support the theory that the Fitbit technology team in the United States performs the recited

27   "providing" step, summary judgment cannot be denied on this basis.

28                                    *        *        *

United States District Court
Northern District of California

In summary, the "providing" step claimed by the '794 patent is performed by the manufacturing and shipment of software to consumers. Dkt. No. 276-2 (Vijh Expert Report) ¶ 166 ("[I]t is obvious and necessarily true that the Accused Instrumentalities are each provided with a software module at the time they are manufactured and shipped to consumers by the Defendant."). Because Fitbit's accused products are manufactured and assembled outside of the United States, Fitbit's performance of the claimed functions occurs outside the United States. This cannot give rise to infringement. *NTP, Inc.*, 418 F.3d at 1318. None of Cellspin's infringement theories compelling a different conclusion are sufficiently supported by the evidence or the patent claims.

Accordingly, the Court grants Fitbit's motion as to this ground.

<div align="center">

c.      <u>Complete Infringing System</u>

</div>

To prove infringement of the asserted '847 system patent, Cellspin must show that a defendant makes, uses, sells, offers to sell, or imports a complete infringing system. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n.2 (Fed. Cir. 2000) ("[O]ne may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention."); *see also Synchronoss Techs.*, 987 F.3d at 1368 ("Direct infringement by 'use' of a claimed system requires use of each and every element of the system.").

Claim 1 of the asserted '847 patent recites the following:

> A mobile application in the Bluetooth enabled cellular phone comprising executable instructions that, when executed by a second processor inside the Bluetooth enabled cellular phone controls the second processor to:
>
>> detect and receive the acquired new-data, comprising:
>>
>> listen for the event notification, sent from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data; and
>>
>> receive the event notification and the acquired new-data, from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein receiving the event notification comprises receiving the signal sent by the Bluetooth enabled data capture device corresponding to the acquired new-data;

1    store the new-data received over the established paired
     Bluetooth wireless connection, in a second memory device of
2    the Bluetooth enabled cellular phone before transfer to a
     website; and

3    use HTTP to transfer the new-data received over the
     established paired Bluetooth wireless connection, along with
4    user information stored in the second memory device of the
     cryptographically authenticated Bluetooth enabled cellular
5    phone, to the website, over the cellular data network;

6    wherein the mobile application further comprises executable
     instructions to control the processor to provide a graphical
7    user interface (GUI) for the new-data.

8    *Id.* at 12:47-13:3.  Fitbit argues that the claim language plainly indicates that an infringing system

9    must comprise a mobile application in – *i.e.*, installed on – a Bluetooth enabled cellular phone; and

10   since Fitbit does not make, sell, or import, a Bluetooth enabled cellular phone, it does not directly

11   infringe.  *See Synchronoss*, 987 F.3d at 1368.  Cellspin counters that the patent claims recite a

12   "cellular phone" as "an environmental limitation rather than an affirmative limitation."  Dkt. No.

13   297 at 15 ("the recited 'cellular phone' performs no function in the Claim, and exists only to

14   provide an environment for the claimed 'mobile application' which, by definition, is designed for

15   (and limited in its application to) a mobile (cellular phone) environment").

16       Cellspin likens this situation to *Nazomi Comms. v. Nokia Corp.*, a case in which the

17   Federal Circuit dealt with the question of whether devices that require a user to unlock

18   functionality by adding to or modifying the device's source code could constitute direct

19   infringement.  739 F.3d 1339, 1345 (Fed. Cir. 2012).  The Court finds that a more analogous case

20   is *Advanced Software Design Corp. v. Fiserv, Inc.*, where the asserted system claim recited a

21   "system for validating . . . a negotiable financial instrument . . . comprising: a scanner . . . and a

22   data processing device programmed [to validate by decrypting or re-encrypting]."  641 F.3d 1368,

23   1374 (Fed. Cir. 2011).  The Federal Circuit observed that "[a]lthough a patented system is 'used'

24   when a party 'controls the system as a whole and obtains benefit from it,' the system of [the

25   asserted claim] does not include an encrypting computer or printer.  [The accused infringer]

26   therefore could infringe simply by controlling the scanner and the decrypting computer."  *Id.*  Like

27   the claim at issue in *Advanced Software*, the system of claim 1 of the '847 patent does not include

28   a "Bluetooth enabled cellular phone."  In this context, the term is not a structural limitation, but an

United States District Court
Northern District of California

1    environmental limitation in which an accused infringer could infringe simply by controlling the

2    phone.

3          Accordingly, Fitbit's motion is denied as to this theory.

4                    d.    *Internal Testing Theory*[8]

5          Fitbit moves for summary judgment of non-infringement against Cellspin's theory that

6    Fitbit directly infringes the patents through the assembly and internal testing of its accused

7    products.  Cellspin responds with a string cite of evidence, adding that "the evidence of record

8    establishes that Fitbit extensively tests its products, and that such tests include the full pattern of

9    infringing use (data capture with transmission to mobile application and web server)."  Dkt. No.

10   297 at 18.  However, the evidence Cellspin points to does not provide sufficient evidence that

11   Fitbit's accused products constitute a system performing all of the recited acts[9]  The cited Fitbit's

12   30(b)(6) witness testimony only broadly states that Fitbit tests its products and functions.  Dkt. No.

13   298-5 (Boccon-Gibod Depo. Tr.).  Cellspin's additional citations to a "physical use-case test

14   report," Dkt. No. 298-11, and a "Fitbit test spreadsheet indicating wide range of tests" do not

15   prove the point, even arguably.  Dkt. No. 298-12.

16         Cellspin's string-cite of evidence is unexplained and analogous to the argument the Federal

17   Circuit found insufficient in *Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP*, 15 F.4th at 1130.

18   There, the Federal Circuit affirmed summary judgment of non-infringement where the patent

19   owner "cited swaths of documents" but "failed to link those documents to the [accused product] or

20   to explain how those documents support its infringement theory."  *Id.* at 1133.  Moreover, the

21   Federal Circuit found that the patent owner had failed to create a genuine issue of material fact

22   where its "arguments [under several theories] amounted to 'conclusory statement[s] . . . without

23   any analysis to support' them" because it "didn't explain how any of these approaches match up to

24   the court's claim construction, how the approaches are actually used in the accused technology,

25   _____

26         [8] This is the same issue contested in *Nike*, *see infra* Section III.B.3, *Garmin, see infra*
     Section III.E.1.c, and *Fossil*, *see infra* Section III.D.1.b.i.

27         [9] Cellspin does not even address the Court's construction that Claim 1 of the '847 Patent
28   requires an order for elements following the terms "configured to" and "controls to."  Dkt. No.
     186 at 9-10.

and how the approaches would meet other limitations of the claims." *Id.* at 1130 (patent owner's "unexplained listing of accused elements that [perform the recited method steps] is insufficient to create a genuine issue of material fact."). Like in *Traxcell*, Cellspin's testing theory fails because the documents offered in support do not "explain how [they] support its infringement theory," and its arguments "amount to 'conclusory statement[s] . . . without any analysis to support' them." There is no explanation how Cellspin's evidence indicates performance of the claimed steps, much less in the order required by the Court's construction. *See E-Pass*, 473 F.3d at 1222 (affirming summary judgment of non-infringement where patentee lacked proof that all claimed method steps were performed in order).

Accordingly, Fitbit's motion is granted as to this theory.

### 2.    Divided Infringement

Both the '752 and '794 patents recite establishing a "paired" Bluetooth connection between the data capture device and a mobile phone. *See, e.g.*, '752 patent at 11:52; '794 patent at 11:56. Fitbit moves for summary judgment of non-infringement as to Cellspin's divided infringement theory on the grounds that (i) only its end users are capable of "establishing a secure paired Bluetooth connection" between the accused Fitbit products and the mobile phone; and (ii) such performance is not attributable to Fitbit.

#### a.    *"establishing a secure paired Bluetooth connection"*

Fitbit argues that its users themselves – not Fitbit – perform the "establishing a secure paired Bluetooth connection" recited by the asserted patents. Fitbit offers supporting testimony from its expert Dr. Harry Bims that to connect to an accused Fitbit product with Bluetooth, a mobile phone operating system presents a user with a "Bluetooth Pairing Request" asking whether the user would like to pair the Fitbit product and the mobile phone via Bluetooth. Dkt. No. 276-11 (Bims Expert Report) ¶ 215. "The user then freely chooses whether to establish a paired Bluetooth connection." Dkt. No. 277 at 14. Both Cellspin's infringement expert Rahul Vijh and Fitbit's 30(b)(6) witness Gilles Boccon-Gibod agree that it is the user who chooses to establish a paired Bluetooth connection. *See* Dkt. No. 276-9 (Vijh Depo. Tr.) at 190:9-21 ("Q. Okay. What is

1   your opinion about who [performs the establishing a paired connection between the Bluetooth-

2   enabled data capture device and the Bluetooth-enabled mobile device]? A. The user performs the

3   step when he is -- by virtue of purchasing the device and setting it up initially and/or, you know,

4   whenever the user establishes a paired connection."); *see also* Dkt. No. 276-10 (Boccon-Gibod

5   Depo. Tr.) at 49:2-12 ("Bluetooth pairing between a device and the mobile phone is not under the

6   control of the Fitbit mobile app.  It's something that the mobile operating system does and that the

7   user chooses to accept or not.").

8          Cellspin responds that source code on Fitbit's accused products "directly carries out this

9   functionality."  Dkt. No. 297 at 19.  Cellspin points to Vijh's report which itself "cites Fitbit

10  Source code . . . detail[ing] parameters specific to the Bluetooth pairing process on the device."

11  Dkt. No. 297 at 19 (citing Dkt. No. 276-2 (Vijh Expert Report) ¶ 143).  Vijh's report offers the

12  source code without any explanation how the code performs the claims.  On this basis, Vijh

13  concludes that the accused products infringe.  Dkt. No. 276-2 (Vijh Expert Report) ¶ 143

14  ("Further, in my personal review of the materials available to me, including the source code made

15  available to me by Defendant, I was able to locate evidence of 'pairing' in accordance with the

16  Court's construction.  Moreover, testing of the Accused Instrumentalities and Accused Mobile

17  Applications confirmed they respectively operate in accordance with the Asserted Claim.").  Vijh

18  does not explain what "evidence of 'pairing'" he locates; nor does he explain what "testing" he

19  performed to confirm infringement.

20         Accordingly, Vijh's "unsupported conclusion on the ultimate issue of infringement is

21  insufficient to raise a genuine issue of material fact."  *Dynacore Holdings*, 363 F.3d at 1277-78.

22                              b.    *"Directs or Controls" Theory*[10]

23         Having concluded that the evidence does not support a finding that Fitbit's source code

24  establishes a "secure paired connection," the Court next considers whether Fitbit users' choice to

25  establish a paired Bluetooth connection is attributable to Fitbit.

26          "Where more than one actor is involved in practicing the steps, a court must determine

27  

28          [10] This is the same issue contested in *Nike*, *see infra* Section III.B.5.a, *Fossil*, *see infra*
    Section III.D.1.b.iii, and *Garmin*, *see infra* Section III.E.1.d.

United States District Court
Northern District of California

1   whether the acts of one are attributable to the other such that a single entity is responsible for the

2   infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir.

3   2015).  "[A]n entity [is] responsible for others' performance of method steps in two sets of

4   circumstances:  (1) where that entity directs or controls others' performance, and (2) where the

5   actors form a joint enterprise."  *Id*.  Cellspin seeks to prove infringement under the former:  "when

6   an alleged infringer conditions participation in an activity or receipt of a benefit upon performance

7   of a step or steps of a patented method and establishes the manner or timing of that performance."

8   *Id.* at 1023.  "[T]he context of the claims and conduct in a particular case will inform whether

9   attribution is proper."  *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1352 (Fed. Cir. 2018)

10  (quoting *Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302, 1380 (Fed. Cir. 2016)).  The Federal Circuit

11  instructs courts to "look for 'evidence that a third party hoping to obtain access to certain benefits

12  can only do so if it performs certain steps identified by the defendant, and does so under the terms

13  prescribed by the defendant.'"  *Id.* (quoting *Mankes*, 822 F.3d at 1380).

14      Fitbit argues that it "does not require users to establish a paired Bluetooth connection to

15  acquire any benefit or engage in any activity associated with use of the Accused Products."  Dkt.

16  No. 277 at 16; *see* Dkt. No. 276-11 (Bims Expert Report) ¶¶ 215-16 (Fitbit expert testifying that

17  "[d]espite not allowing the operating system to establish a Bluetooth paired connection, my device

18  synced and still kept track of my health information").  Cellspin responds with the following

19  "facts to support its contention that Fitbit directs and controls an end user's actions:"

> (i) Fitbit requires all users to create an online account; (ii) user data
> will not be sent to Fitbit servers until user creates an account; (iii) with
> the exception of Wifi transmission in certain devices, users are not
> permitted to upload data from Fitbit Devices to Fitbit servers unless
> it is done via a paired Fitbit Mobile Application; (iv) all connections
> between Fitbit Devices and Mobile Applications are paired; and (v)
> users cannot use Live Tracking without Bluetooth.

24  Dkt. No. 297 at 20.  Items (i), (ii), and (iv) do not identify benefits that Fitbit conditions upon

25  performing the "establishing a paired Bluetooth connection" step.  Likewise, item (iii) is

26  Cellspin's concession that users can connect their Fitbit devices with a mobile phone via Wi-Fi

27  instead of Bluetooth.  While item (v) – "users cannot use Live Tracking without Bluetooth" – may

28  plausibly be a benefit conditioned upon performance, it is offered without any citation to the

1    record and thus "attorney argument [] insufficient to overcome a motion for summary judgment."

2    *Ferring B.V.*, 437 F.3d at 1193 (citation omitted); *see also Glaverbel Societe Anonyme v.*

3    *Northlake Mktg. & Supply, Inc.*, 45 F.3d at 1562 ("There must be sufficient substance, other than

4    attorney argument, to show that the issue requires trial.").

5            Cellspin also offers Vijh's expert testimony as support, but Vijh never provided testimony

6    on this issue let alone examine the operation of Fitbit's accused products without Bluetooth.  *See*

7    Dkt. No. 276-9 (Vijh Depo. Tr.) at 147:7-14 (Vijh's testimony that he never pressed the "cancel

8    button" in response to the "Bluetooth Pairing Request" asking whether the user would like to pair

9    the Fitbit product and the mobile phone).  Moreover, Vijh provides an opinion defining one of

10   "the benefits of the claimed *inventions* [a]s the ease of use and the ability to seamlessly and

11   effortlessly transfer data," Dkt. No. 199-8 (Vijh Expert Report) ¶ 51 (emphasis supplied), but this

12   is not an opinion for the benefit *Fitbit* conditions upon participation of steps recited in the method

13   claims.

14           Cellspin contends that "the *only* way a consumer user can enjoy the full benefits of the

15   Fitbit Devices (namely: effortlessly transfer personal fitness data between: (i) a data capture

16   device; (ii) an intermediary mobile device; and (iii) the Internet) is to pair them with a Fitbit

17   Mobile Application and sync their data with their online account."  Dkt. No. 297 at 21.  The Court

18   recognizes that intangible benefits like the effortless transfer of personal fitness data is sufficient

19   to satisfy *Akamai*.  *See Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1382 n.1 (Fed. Cir. 2017)

20   ("We reject the district court's suggestion that "intangible benefits" that are conditioned upon

21   performance of claim steps are insufficient to satisfy the first prong of *Akamai V*.").  However, the

22   benefit Cellspin identifies here is nothing more than a conclusory assertion.  Cellspin offers no

23   evidence from which a reasonable jury could conclude that Fitbit "conditions" its end users'

24   "effortless[] transfer [of] personal fitness data" on its end users' performance of the claimed

25   method steps.

26           Accordingly, Fitbit's motion is granted as to this ground.

27                   *c.*      <u>*No Indirect Infringement*</u>

28           Because Cellspin cannot show direct infringement of the asserted method patents, Cellspin

United States District Court
Northern District of California

cannot prove indirect infringement of the asserted method patents. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("Liability for inducement must be predicated on direct infringement."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement.").

                3.    *"user identifier" or "user information"*[11]

The asserted claims of the '794 and '752 patents require "attaching" or "applying" a "user identifier" at an intermediary device and the asserted claims of the '847 patent require that "user information" be "stored" at an intermediary device before being sent "along with" new data. '794 patent at 12:20-24 (claim 1); *id.* at 14:46-50 (claim 16); '752 patent at 12:17-37 (claim 1); *id.* at 14:26-32 (claim 12); '847 patent at 12:62-67.

Cellspin's infringement contentions disclose that a "username or email address, or information based off of a user or the user's associated wearable device" is the claimed "user identifier" or "user information." *See* Dkt. No. 277-14 at 100 ('794 patent infringement contentions for Fitbit Versa 2); Dkt. No. 277-16 at 129 ('752 patent infringement contentions for Fitbit Versa 2); Dkt. No. 277-18 at 93 ('847 patent infringement contentions for Fitbit Versa 2). Fitbit argues that its accused products cannot "apply," "attach," or "store" a "user identifier" or "user information" because they do not "apply," "attach," or "store" usernames or email addresses. According to Fitbit, its products instead track data using a device ID. For support, Fitbit cites Dr. Bims's testimony that its accused products pass the device ID from the phone to Fitbit's server without attaching, applying, or storing any user information at any intermediary device (tracker). Dkt. No. 276-11 (Bims Expert Report) ¶¶ 515-22; Dkt. No. 277 at 18 ("The phone (i.e., intermediary device) is merely a passive relay" (citing Dkt. No. 276-11 ¶ 519)).

Cellspin responds with a different infringement theory involving the use of "OAuth tokens" as the "user information" or "user identifier." Dkt. No. 297 at 23-24. However, Fitbit

---

[11] This is similar to the issues contested in *Nike, see infra* Section III.B.2.a, and *Fossil, see supra* Section III.D.2.b.

argues that this is an improper new theory that Cellspin did not disclose in its infringement contentions.  Dkt. No. 277 at 19-20.  Cellspin counters that it gave Fitbit reasonable notice of its theory where its infringement contentions disclosed "username or email address, or information based off of a user or the user's associated wearable device" as the "user information" or "user identifier."  *Id.* at 24.

This District's Patent Local Rules require that infringement contentions specifically identify for each asserted limitation "the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function."  Patent L.R. 3-1(c); *see also KlausTech, Inc. v. Google LLC*, No. 10-CV-05899-JSW-DMR, 2018 WL 5109383, at *4 (N.D. Cal. Sept. 14, 2018) ("[T]he purpose of the local patent rules [is to] require parties to 'disclose the basis for their contentions' in order to "make them explicit and streamline patent litigation.'"), *subsequently aff'd*, 792 F. App'x 954 (Fed. Cir. 2020).  "[T]he Patent Local Rules do not require perfect clarity, only reasonable notice that is 'as specific as possible' given the information of which a plaintiff is aware."  *Illumina, Inc. v. BGI Genomics Co.*, No. 19-CV-03770-WHO, 2021 WL 4126005, at *4 (N.D. Cal. Sept. 9, 2021) (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *2 (N.D. Cal. June 11, 2015) ("*Finjan I*")).

The Court concludes that the term "information based of a user or the user's associated wearable device" does not disclose a theory based on the use of "OAuth tokens," much less any infringement theory for "user information" or "user identifier."  Because Cellspin did not disclose this theory in its infringement contentions, this theory is barred from trial.  *See Finjan, Inc. v. Qualys Inc.*, No. 4:18-CV-07229-YGR, 2021 WL 1253651, at *2 (N.D. Cal. Apr. 5, 2021) ("*Finjan II*") ("[A] party may not use an expert report to introduce new infringement theories, new infringing instrumentalities, new invalidity theories, or new prior art references not disclosed in the parties' infringement contentions or invalidity contentions." (quoting *Looksmart Group, Inc. v. Microsoft Corp.*, 386 F. Supp. 3d 1222, 1227 (N.D. Cal. 2019))); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341-YGR, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014) ("Undisclosed theories 'are barred . . . from presentation at trial (whether through expert opinion testimony or otherwise).'").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Accordingly, Cellspin does not raise a genuine material dispute that Fitbit's accused products "apply," "attach," or "store" a "user identifier" or "user information." The Court grants Fitbit's motion for summary judgment on this ground.

### 4.   *"cryptographically authenticate"*[12]

Claim 1 of the '847 patent requires that the "Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when the first Bluetooth communication device establishes the paired Bluetooth wireless connection." '847 patent at 12:17-25. The Court has construed "cryptographically authenticated" as "verified as legitimate by use of encryption and decryption involving an algorithm." Dkt. No. 186 at 18. Fitbit moves for summary judgment of non-infringement of the '847 patent, contending that Cellspin cannot offer evidence that the accused Fitbit products cryptographically authenticate.

Cellspin counters that "it is self-evident that encrypted data sent by one device must be decrypted by the receiving device in order for the transmitted data to be used." Dkt. No. 297 at 26. This attorney argument is offered without expert testimony or any support in the record, and thus does not create a dispute of material fact whether the accused products perform decryption. At the stage of summary judgment, we are beyond the realm of plausibility.

Cellspin submits Vijh's testimony that "[a]uthentication is used in both Bluetooth LE Legacy Connection Pairing and Bluetooth LE Secure Connections Pairing, and both use cryptographic keys for authentication. The authentication step follows key generation in the pairing process, with one objective being to protect against 'Man-In-The-Middle' (MITM) attacks." Dkt. No. 277-6 (Vijh Expert Report) ¶ 56. Again, this paragraph lacks evidentiary value because it is made without any citation to the record and does not explain how the accused products perform encryption or decryption. *See Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013) ("ipse dixit statements . . . are not sufficient to avoid summary judgment"); *Dynacore Holdings*, 363 F.3d at 1278 ("It is well settled that an expert's

---

[12] This is similar to the issues contested in *Under Armour*, *see infra* Section III.C.1.b, *Fossil*, *see infra* Section III.D.2.a, and *Nikon*, *see infra* Section III.F.4.a.

1   unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine

2   issue of material fact, and that a party may not avoid that rule simply by framing the expert's

3   conclusion as an assertion that a particular critical claim limitation is found in the accused

4   device.").

5         Cellspin further argues that "the pairing protocol in the Bluetooth Specification . . .

6   evidences how both encryption and decryption take place at each respective device during pairing

7   authentication." Dkt. No. 297 at 27. For support, Cellspin offers its infringement contentions, two

8   Fitbit documents, and Fitbit's 30(b)(6) witness testimony. However, a review of these documents

9   (again offered without explanation) reveals that they do not actually support a conclusion that the

10   Fitbit accused products perform decryption. The first document, a Fitbit technical document,

11   identifies a tracker – presumably a Fitbit accused product – and appears to list out its performed

12   functions, none of which include decryption. Dkt. No. 298-18. While it states that a mobile

13   device and a tracker will use a 128-bit encryption key "to encrypt all data sent through the Fitbit

14   activity service data source characteristic," it never states that a tracker performs decryption. As

15   for the next cited Fitbit technical document, at most, it describes decryption as performed by a

16   mobile device, but it does not describe a tracker that performs decryption. Dkt. No. 298-29 at 4.

17         Cellspin also cites to a Fitbit source code excerpt that purportedly "contains a code

18   comment in the device firmware to 'Only update live data if we are authenticated . . .'". Dkt. No.

19   277-6 (Vijh Expert Report) ¶ 89 (citing Dkt. No. 298-20 at 2). However, for a reasonable juror to

20   conclude that this document indicates encryption and decryption would requires two unfounded

21   presumptions: First, that Bluetooth authentication necessarily means both "encryption and

22   decryption involving an algorithm." Second, that authentication is performed at the tracker.

23   These presumptions, however, have no foundation in the record. Dkt. No. 298-20 at 2. Cellspin

24   next offers another line of Fitbit source code stating "[i]f we're not authenticated, don't bother and

25   if we're not bonded, don't bother capturing the Heart Rate data." Dkt. No. 298-21 at 2. This fails

26   for the same reason that the first line of Fitbit source code fails: There is no evidence for

27   Cellspin's contention that decryption occurs at the tracker – only the assumption that a tracker

28   performs decryption because "a user's personal fitness data [is transmitted] via the user interface."

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1   No. 277-6 (Vijh Expert Report) ¶ 152; Dkt. No. 297 (Opp.) at 27 ("Mr. Vijh has stated that the

2   fact that user data is made available at the Mobile Application evidences the fact of decryption.").

3   Cellspin does not satisfy its burden at this stage.  It never provides the evidence justifying the

4   conclusion that Fitbit's accused products perform encryption and decryption.  For example,

5   neither the evidence nor Vijh explains why the transmitted information is not solely encrypted and

6   decrypted by the mobile device before being transmitted to the tracker.

7       Accordingly, Cellspin has not presented any evidence upon which a reasonable jury could

8   conclude that Fitbit's accused products perform decryption as required by the Court's construction

9   of "cryptographically authenticate."  Thus, the Court grants Fitbit's motion as to this ground.

10      5.    *Processors*

11          a.    *"first processor"*[13]

12      The asserted claims of the '847 system patent recite "a first processor" "configured to"

13  perform three steps: (1) "acquire new-data," (2) "store the acquired new-data," and (3) "send an

14  event notification."  '847 patent at 12:27-31.  Fitbit moves for summary judgment of non-

15  infringement on the ground that Cellspin cannot demonstrate the accused Fitbit products contain a

16  "first processor" that performs the three steps required by the claims of the '847 patent.

17      Cellspin counters by stating that Vijh's report explains that the accused Fitbit products

18  contain a "processor . . . configured to perform [the acquisition, storing, and sending of new data

19  claimed in the asserted '847 patent], given that the Fitbit hardware carries out the instructions as

20  defined by the Fitbit software."  Dkt. No. 297 at 29-30 (citing Dkt. No. 276-2 (Vijh Expert Report)

21  ¶¶ 91, 93, 94, 95). However, the assertion that Fitbit's hardware may "carr[y] out the instructions

22  as defined by the Fitbit software" improperly presumes that:  (1) Fitbit's software defines the

23  functions of acquiring, storing, and sending new data recited by the asserted patent; and (2)

24  Fitbit's hardware contains one "first processor" configured to perform all three claimed

25

26

27      [13] This is similar to the issues contested in *Nike*, *see infra* Section III.B.2.b.ii, and *Garmin*,
    *see infra* Section III.E.4.a.

28

functions.[14]  Without any evidence or explanation supporting these unspoken presumptions, Vijh's testimony offers little evidentiary value to Cellspin's burden on summary judgment.

Further, Cellspin asserts that chipsets operating like the ones in Fitbit's accused products "common[ly]" contain a main CPU, and, based on this assertion, concludes that the main CPU performs the role of the recited "first processor."  Dkt. No. 297 at 28.  However, this theory – "common integrated chipsets" contain main CPUs – does not persuade because it is unsupported attorney argument.  *See Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d at 1562 ("There must be sufficient substance, other than attorney argument, to show that the issue requires trial."); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

Cellspin continues that "[t]he presence of a first processor is evident based upon the functionality of the Accused Devices and the fact that there is operating code."  Dkt. No. 297 at 28.  However, saying that a device contains the claimed "first processor" simply because the devices function in a certain way and because "there is operating code" does not necessarily imply that the device contains a "first processor" "configured to" perform three specific steps:  "acquire new-data," "store the acquired new-data," and  "send an event notification."  Even assuming that a *device* performs the claimed functions, Cellspin offers no proof that a *single processor* operating the device is responsible for these activities.  Cellspin's only support is a claim that Vijh identifies the claimed "first processor" in a multi-processor device based on evidence disclosed in its infringement contentions.  Dkt. No. 297 at 28 ("Moreover, Mr. Vijh relies on standard computer system architecture and the exemplary Silicon Labs EFM 32 Microcontroller in identifying the infringing first processor (microcontroller) on a so-called "multi-processor" device.  Still further, Mr. Vijh relies upon Fitbit's own Technical Documents illustrating the typical main CPU architecture of the Accused Devices." (internal citations omitted)).  That argument lacks foundation.  None of the evidence on which Cellspin claims Vijh relied is actually cited in his

---

[14] The latter presumption is especially difficult to square with Fitbit's evidence that the accused Versa 2 and Charge 3 products operate with multiple processors that it claims are each responsible for different functions.  *See* Dkt. No. 276-10 at 21:10-15 (Fitbit 30(b)(6) witness testimony stating that Fitbit devices are multiprocessor devices).

1    report.  Instead, each paragraph in Vijh's report to which Cellspin cites contains the problematic

2    formula of conclusory-assertion-followed-by-unexplained-source-code.  This is insufficient

3    evidence to support the conclusion that a "first processor" performs the recited functions.

4        Cellspin fails to identify a genuine dispute of material fact that the Fitbit accused products

5    contain the "first processor" "configured to" perform three steps:  (1) "acquire new-data," (2)

6    "store the acquired new-data," and (3) "send an event notification" required by the '847 patent.

7    Accordingly, the Court grants summary judgment of non-infringement of the '847 patent.

8                    *b.*    <u>*Teardowns Supporting Expert's Representativeness Opinion*</u>

9        Next, Fitbit argues that Cellspin improperly relies on teardowns of processors used in *other*

10   non-representative accused Fitbit products to explain the operation of processors in representative

11   accused Fitbit products.  Cellspin bases its infringement analysis of the representative Fitbit Versa

12   2 and Charge 3 products on non-party teardowns of Fitbit Surge and Blaze products revealing that

13   the products use an "EFM32" microcontroller with an "ARM Cortex M3 processor."  *See* Dkt. No.

14   276-7 ('847 patent infringement contentions against Versa 2) at 12-16.  Cellspin's expert relies on

15   these results to explain how the Versa 2 and Charge 3 products allegedly infringe the '847 patent.

16   Fitbit argues that this reliance is improper because Cellspin cannot offer any evidence that the

17   "EFM32" microcontroller with an "ARM Cortex M3 processor" identified in the Surge and Blaze

18   are representative of the processors in the Versa 2 and Charge 3.

19       Cellspin responds by pointing to Vijh's deposition testimony that "the typical hardware

20   architecture of microcontrollers satisfies the limitation."  Dkt. No. 297 at 29.  However, at best, the

21   testimony can be read as the conclusory assertion that the Versa 2 and Charge 3 are representative

22   of the Fitbit accused products, and that the fact that the products operate with different operating

23   systems, interfaces, and heart rate sensors do not change his analysis.  Dkt. No. 298-6 (Vijh Depo.

24   Tr.) at 120:23-125:11.  It is not an opinion on representatives, let alone an expert opinion *how or*

25   *why* the processor in the Versa 2 is sufficiently similar to the teardown-analyzed Cortex M3

26   processor for infringement purposes.

27       Further, Cellspin cites to its infringement contentions without explanation.  *See* Dkt. No.

28   277-11 at 11.  However, citing to one's own "contentions" without any explanation or

United States District Court<br>Northern District of California

23

1    substantiated expert testimony constitutes mere attorney argument. *See Glaverbel Societe*

2    *Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d at 1562 ("There must be sufficient substance,

3    other than attorney argument, to show that the issue requires trial."); *Enzo Biochem, Inc. v. Gen-*

4    *Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for

5    evidence."); *see also Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir.

6    2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no

7    substitute for competent, substantiated expert testimony. It does not, and cannot, support

8    Clontech's burden on summary judgment."). Likewise, Cellspin's attorney argument that "[t]he

9    specific model number of the processor in each respective Accused Device is not required" is

10   unsupported.[15]

11       The Court concludes that Cellspin fails to raise a genuine dispute of fact that the processor

12   in Fitbit's Versa 2 (and Charge 3 products) and the M3 processor in Fitbit's Surge and Blaze

13   products function sufficiently similarly for infringement purposes. Thus, Cellspin fails to raise a

14   genuine dispute of material fact that the accused Versa 2 and Charge 3 products infringe the

15   asserted '847 patent.

16                                    *      *      *

17       For the reasons above, Fitbit's motion for summary judgment is granted.[16]

18   //

19   //

20   //

21   //

22   //

23

24       [15] Cellspin offers a document that it claims identifies an ARM Cortex M4 processor in the
     Versa 2. However, it is unclear from the document what processors operate the accused Versa 2

25   and Charge 3 products. *See* Dkt. No. 298-22 (technical Fitbit Versa 2 specification sheet that does
     not identify an ARM Cortex M4 processor); Dkt. No. 298-31 (Fitbit spreadsheet listing an ARM

26   Cortex M3 processor under some unspecified Fitbit product).

27       [16] The Court does not reach Fitbit's argument that the Versa 2 and Charge 3 are not
     representative of the unanalyzed Fitbit products because it finds that the analyzed Versa 2 and

28   Charge 3 do not infringe the asserted patents.

United States District Court
Northern District of California

1    //

2    //

3    **B.**    ***Cellspin Soft, Inc. v. Nike, Inc.* (17-5931)**

4    Cellspin accuses the following Nike products of infringing the asserted patents:

5    - Apple Watch Nike Series 5 (GPS) with Nike Sport Band 44mm Silver Aluminum Case,
6    - Apple Watch Nike Series 5 (GPS + Cellular) with Nike Sport Band 40mm Silver Aluminum Case,
7    - Apple Watch Nike Series 5 (GPS) with Nike Sport Band 40mm Silver Aluminum Case,
8    - Apple Watch Nike Series 3 (GPS + Cellular) 38mm Running Watch,
9    - Apple Watch Nike Series 3 (GPS) 38mm Running Watch,
     - Apple Watch Nike Series 3 (GPS) 42mm Running Watch,
10   - Apple Watch Nike Series 3 (GPS + Cellular) 42mm Running Watch,
11   - Apple Watch Nike+ Series 4 (GPS + Cellular) 40mm Sport Watch,
12   - Apple Watch Nike+ Series 4 (GPS) 44mm Sport Watch,
     - Nike+ SportWatch GPS,
13   - FuelBand SE, and
     - FuelBand.

14   Cellspin and its expert Rahul Vijh analyze the Apple Watch Nike Series 5 as representative of all

15   accused products.  Nike moves for summary judgment of non-infringement.  Dkt. No. 198.[17]  The

16   Court first examines the FuelBand products, then the Apple Watch Nike products.

17           *1.    FuelBand Products*

18           Nike moves for summary judgment of non-infringement as to the FuelBand products.  It

19   argues that the analyzed Apple Watch Nike Series 5 is not representative of the unanalyzed

20   FuelBand products.

21           "Where a patent holder accuses multiple models of a defendant's accused product of

22   infringing on the patented product, the patent holder must prove that each and every accused

23   model contains every limitation."  *Pulse Elecs., Inc. v. U.D. Elec. Corp.*, No. 3:18-CV-00373-

24   BEN-MSB, 2021 WL 981123, at *19 (S.D. Cal. Mar. 16, 2021) (citing *Duncan Parking Techs.,*

25   *Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019)); *see also Rambus Inc. v. Hynix*

26

27   ────────────────

28       [17] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Nike, Inc.*, No.
     4:17-CV-5931 (N.D. Cal.).

United States District Court
Northern District of California

25

*Semiconductor Inc.*, 642 F. Supp. 2d 970, 976 (N.D. Cal. 2008) ("[A]s the party asserting infringement, [Cellspin] bears the burden of persuasion at trial as to whether or not each of [Nike's] accused products infringe its claims." (citing *L & W, Inc. v. Shertech*, Inc., 471 F.3d 1311, 1317-18 (Fed. Cir. 2006))).  "However, a patent holder may carry its burden of proof by showing that (1) a representative example infringes and (2) every accused model conforms to that representative example."  *Pulse Elecs., Inc.*, 2021 WL 981123, at *19; *see also Infineon Techs. AG v. Volterra Semiconductor*, No. 11-CV-06239 MMC (DMR), 2013 WL 5366131, at *4 (N.D. Cal. July 31, 2013) ("A patentee is not required to provide a claim chart for each accused product if the chart provided is representative of the other accused products.").

As the party moving for summary judgment, Nike must either produce evidence demonstrating the Apple Watch 5 is not representative of the FuelBand products or show that Cellspin does not have enough evidence to prove this element at trial.  *See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.").  Here, Nike seeks to do the latter.  The Court agrees for the following reasons.

First, the Court has concerns with the sufficiency and reliability of Cellspin's expert Vijh's testimony on representativeness.  Vijh testified at his deposition that he only tested the Apple Watch Nike Series 5 product and never obtained or tested the FuelBand products or tried to connect them to any mobile app.[18]  *See* Dkt. No. 198-10 (Vijh Depo. Tr.) at 36:1-17 ("Q So you've never tested the Fuel Band or Fuel Band SE products, correct? A That's correct. I tried purchasing them back in 2020, but these products were no longer available anywhere. Q All right.

---

[18] Similarly, Vijh testified that he never obtained, analyzed, or tested the other accused versions and series of the Apple Watch products in this case – Series 3 and 4.  Dkt. No. 198-10 (Vijh Depo. Tr.) at 37:10-21 ("THE WITNESS:  No, I did not test the Series 4 because my understanding is that they work in substantially the same way."); *id.* at 22-25 ("THE WITNESS: For the same reason as my previous answer, I have not tested the Series 3 models because I think – because my understanding is that they work in substantially the same way").

So you've never even held one in your hand, correct? A I have not. Q You've never tried to connect a Fuel Band or Fuel Band SE with any mobile application, correct? A As I said, I tried very hard to procure these devices back in 2020, but they were not available on Nike website. And they were not available anywhere in any store or online at that point.").  This calls into question how Vijh was able to conclude that the unanalyzed accused FuelBand products infringe in the same way as the analyzed Apple Watch Nike Series 5.[19]

Vijh bases his representativeness opinion on a review of user manuals, technical documents, and Nike source code, and on the grounds that each accused unanalyzed device "is a smartwatch or wearable wrist data capture device having a variety of on-board sensors for capturing user data such as heart rate and step-count," and "is Bluetooth-enabled and pairs via Bluetooth with one or more of the Accused Mobile Applications."  Dkt. No. 204 at 9 (citing Dkt. No. 198-5 (Vijh Expert Report) ¶¶ 63-64).  Taken to its logical conclusion, this opinion covers any wearable device capturing user data and pairing with a mobile application via Bluetooth.  That scope is untenable.  Indeed, in this very dispute, Cellspin argues that a device developed by Apple in 2019 and a device developed by Nike in 2012 operates in the same way.  Moreover, beyond this conclusory comparison, there is no detailed analysis or explanation from which a reasonable jury could determine that the FuelBand products function like the Apple Watch for purposes of infringement.  In other words, the expert testimony is unexplained *ipse dixit* testimony that does not amount to sufficient evidence.  *See Parallel Networks*, 704 F.3d at 970 ("ipse dixit statements . . . are not sufficient to avoid summary judgment"); *Dynacore Holdings*, 363 F.3d at 1278 ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

Second, Vijh's conclusion on the representativeness of the FuelBand products is incorrect.

---

[19] Further, Vijh testifies that, in his analysis, he never obtained or reviewed any source code for the Apple Watch 5 or for any Apple Watch Nike product.  *See* Dkt. No. 198-10 (Vijh Depo. Tr.) at 24.  This underscores reliability concerns with how Cellspin's expert was able to conclude that the Apple Watch 5 infringed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  It is based on the opinion that the FuelBand products "pair[] via Bluetooth with one or more of the

2  Accused Mobile Applications."  Dkt. No. 198-5 (Vijh Expert Report) ¶ 64 (explaining that Apple

3  Watch Series 5 is representative of the FuelBand products because "each such device is Bluetooth-

4  enabled and pairs via Bluetooth with one or more of the Accused Mobile Applications").  As Nike

5  points out, the FuelBand products do not pair with any identified "Accused Mobile Application."

6  *Id.* ¶¶ 3, 65 (listing out "specifically identified Accused Mobile Applications for purposes of this

7  Written Report").  The FuelBand products only operate with the Nike+ FuelBand App, a mobile

8  app that is neither listed in the infringement contentions or in Vijh's expert report.  Cellspin

9  responds that Nike was aware that Nike+ FuelBand App was part of the case even though it was

10  not specifically identified.  Cellspin claims that Nike+ FuelBand App was disclosed in its

11  infringement contentions accusing all devices "when such are used in conjunction with Nike

12  Mobile Applications (as identified in the appended charts)."  Dkt. No. 204-3 (Cellspin

13  Infringement Contentions) at 3.  Cellspin also notes that its original complaint and amended

14  complaint identified the Nike+ FuelBand app as an infringing Nike Mobile Application.  Dkt. No.

15  1 (original complaint) ¶ 11; Dkt. No. 49 (amended complaint) ¶ 27.  While Cellspin calls this

16  mistake "inadvertent," it is difficult to understand why Cellspin omitted the Nike+ FuelBand App

17  from both its contentions and expert report.  Further, this mistake was not harmless.  As a result of

18  its omission, Cellspin did not review the app's source code or any other materials to understand

19  how it works, and thus did not provide any limitation-by-limitation analysis explaining how the

20  FuelBand App purportedly infringes.

21        Third, beyond Cellspin's conclusory expert opinion on representativeness, Cellspin offers

22  string cites of documents without explanation as to how they raise a genuine dispute of material

23  fact on representativeness.  Cellspin asserts that "Mr. Vijh explains that his review of the operation

24  and Source Code for the Accused Mobile Applications indicates that each such Application

25  infringes in the same way" and, adding that Vijh's "conclusions are fully supported by the

26  evidentiary record," *id.* at 10, offers a supporting string cite of ten documents, *id.* at 11.  This does

27  not explain how the documents indicate representativeness.  *See Traxcell*, 15 F.4th at 1133

28  (affirming district court grant of summary judgment of non-infringement where patentee "cited

28

swaths of documents . . . [b]ut failed to . . . explain how those documents support its infringement theory"); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG*, 249 F.3d at 1353 ("It is not the trial judge's burden to search through lengthy technologic documents for possible evidence."); *see also Keenan*, 91 F.3d at 1279 (district court is not obligated "to scour the record in search of a genuine issue of triable fact"); *OSRAM Sylvania, Inc.*, 701 F.3d at 797 ("Where, as here, the record is devoid of meaningful analysis, we will not conduct such an analysis in the first instance.").

Cellspin also asserts that each accused mobile applications infringes in the same way because each "receives data via Bluetooth from the Accused Instrumentalities in substantially the same manner, and each makes use of HTTP or HTTPS to upload content." Dkt. No. 204 at 11. Even assuming that performance of one feature is enough to raise a genuine dispute of material fact as to representativeness,[20] Cellspin's efforts fail for lack of evidentiary support. To support the "use of HTTP or HTTPS to upload content," Cellspin's opposition brief offers the following *eight* lines of text:

> *See* Exh. CNE-02 (Vijh) at ¶¶ 65, 126-127, 130; Exh. CNE-26 (HTTP code); Exh. CNE-26; Exh. CNE-27; Exh. CNE-03 at Elements 1.I.e.iv.A, 1.I.e.iv.B, and 1.I.e.vi (pp. 149-150, 153-155, 165-167) (including sniffing log evidence of HTTP transmission); Exh. CNE-15 (continuous sync to platform); Exh. CNE-28 (end to end flow includes HTTP every 15 seconds); Exh. CNE-29 (code for post path). Likewise, each employs event notifications in the same way. *See* Exh. CNE-02 (Vijh) at ¶¶ 72, 73, 114-117, 119- 120; Exh. CNE-03 at Elements 1.I.c-1.I.c.iv.A (pp. 60-102) (including sniffing logs indicating L2CAP payloads); Exh. CNE-16 at 11140 and 11142 (sync and metric updates); Exh. CNE-30 at 9273-74, 9277 (event signals);

---

[20] Cellspin disputes Nike's proffered fact that "[a] mobile application is identified as an element of Cellspin's infringement theory as to multiple claim limitations in all asserted claims." *See* Dkt. No. 208-1 (Nike's Reply Separate Statement of Material Facts) at 2-3. Cellspin argues that "[a]t least Claim 1 of the '752 Patent does not recite a mobile application as an affirmative element." *Id.* However, Cellspin's argument is contradicted by its own expert's admission in his expert report for claim 1 of the '752 patent. *See* Dkt. No. 198-5 (Vijh Expert Report) ¶ 108 ("The Accused Instrumentalities are each configured such that they perform a method of transferring data (such as user exercise data) from a Bluetooth enabled capture device (i.e., an Accused Instrumentality) to a remote server via a Bluetooth enabled mobile device (i.e., one or more of the Accused Mobile Applications installed on a Bluetooth enabled cellular phone (such as, for example, an iPhone or Android phone)).").

United States District Court
Northern District of California

1    Exh. CNE-31 (GATT notifications); Exh. CNE-32 (code for pushing
     data updates).

2    *Id.* These descriptions fail to demonstrate how the mobile applications all use HTTP or HTTPS to

3    upload content in a similar way for purposes of representativeness.  *See Traxcell*, 15 F.4th at 1133.

4        In summary, Cellspin does not meet its burden at summary judgment because it presumes

5    what it must offer evidence of.  Nike's motion for summary judgment of non-infringement is

6    granted as to the FuelBand products.[21]

7            2.    *Apple Watch Nike*

8               a.    *"attaching" or "applying" user identification to "new data"*[22]

9        The asserted '794 and '752 patents recite that a Bluetooth enabled mobile device performs

10   "attaching" or "applying" a "user identifier" to "obtained new data."  '794 patent at 12:20-24

11   (claim 1); *id.* at 14:46-50 (claim 16); '752 patent at 12:17-37 (claim 1); *id.* at 14:26-32 (claim 12).

12   Nike moves for summary judgment of non-infringement of the '794 and '752 patents on the

13   grounds that the Apple Watch Nike – not a claimed mobile device – applies or attaches user

14   identification information to the new data.

15       Nike argues that it does not infringe the above limitations because the Apple Watch

16   functions without use of a mobile phone and can instead operate over the internet through WiFi or

17   cellular connection.  Nike offers a declaration from its 30(b)(6) witness Michael Austin that the

18   Nike app – the "NRC app" – running on the Apple Watch Nike device applies or attaches the user

19   identifier information to the activity data.  *See* Dkt. No. 198-3 (Austin Decl.) ¶ 15 ("First, the NRC

20   app running on the Watch packages the new activity data with a header that contains the Nike

21   cloud destination. . . . Second, the NRC app running on the Watch includes within the header, an

22   identifier associated with the user."); *id.* ¶ 18 ("After the Nike cloud destination and user identifier

23   are included in the header that accompanies the NRC activity data, the NRC app running on the

24   Watch asks the Apple Watch's operating system to send the NRC activity data, along with the user

25

26       [21] The Court does not reach Cellspin's direct or indirect infringement allegations against
     the FuelBand products because it finds that the analyzed Apple Watch Nike Series 5 is not
27   representative of the FuelBand products.
         [22] This is similar to the issues contested in *Fitbit*, *see supra* Section III.A.3, and *Fossil*, *see*
28   *infra* Section III.D.2.b.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  identifier, to the Nike cloud destination.").

2       Austin states that the NRC App and Watch operating system sends data to the cloud using

3  (A) the Watch's Wi-Fi, (B) the Watch's cellular connection, or (C) the Nike app on the phone.  *Id.*

4  Of those three methods, only one method – option (C) – can use the mobile phone to send the data

5  to the cloud.  "[I]n this last case (C), the NRC app on the iPhone, if present on the iPhone, does

6  not attach or apply any user identifier or Nike cloud destination address to the NRC activity data

7  or to the header that encapsulates it; those pieces of information were already attached by the NRC

8  app running on the Watch so the iPhone acts as merely a passive relay of data between the Watch

9  and the Nike cloud destination."  *Id.*  Nike explains that "[i]f the Nike app on the Apple Watch

10  Nike were instead designed to rely on the mobile phone to attach user identification information,

11  then data sent directly from the Watch to the receiving cloud server (bypassing the phone) could

12  not be associated with any user."[23]  Dkt. No. 198 at 20.

13       Cellspin responds that Austin "testified that the user data is assigned a unique identifier at

14  the time it is transmitted from the mobile device to the server – not when it is received from the

15  Apple Nike Watch."  Dkt. No. 204 at 19.  That is not what Austin said.  Instead, Austin says:

16          BY MR. FULLER:
        Q· · How does the activity service know which user's account the data
17          should go to?
        MR. MAGGIORE:· Same objection.
18          THE WITNESS:· The account that's logged in on the phone at the
        time that data is sent.
19          BY MR. FULLER:
        Q· · So, when the data is sent to the activity service, I take it there's
20          some indicator or number that's uniquely associated with that user
        that tells the activity service which account the data should go to.
21          A· · Basically, yes.

22  Dkt. No. 205-34 (Austin Depo. Tr.) at 44:11-22.  Austin never testifies that a mobile phone

23  attaches a user identifier to data.  Viewed in the light most favorable to Cellspin, Austin's

24  testimony can only be read to say that data is sent to an activity service with a unique identifier for

25  each user.  Cellspin also misstates that Jon Gale, another Nike 30(b)(6) witness, confirmed this

26

27      [23] Nike explains that the inventor of the asserted patents explained in a rebuttal expert report he submitted in this case that one of the benefits of the patented technology was "to
28  purportedly leverage the processing power of the mobile phone as opposed to that of the wearable device."  Dkt. No. 198-27 (Singh Expert Rebuttal Report) ¶ 66.

1   functionality.  Dkt. No. 204 at 19.  Gale only testified that "[w]hen [a Nike] account is created,

2   then they have unique credentials for that user . . . each user has a single log-in ID for their

3   account."  Dkt. No. 205-32 (Gale Depo. Tr.) at 60:3-11.

4         Next, Cellspin cites to Vijh's report claiming that Vijh explained "the infringing user

5   identifier is a unique set of credentials assigned so that the data can be properly attributed to the

6   individual user; such credentials are applied at the mobile device."  Dkt. No. 204 at 19.  However,

7   the report only offers conclusory assertions that the patent limitations are met.  For example, as

8   proof, Cellspin offers paragraph 126 of the expert report, which deals with the limitation "wherein

9   the Bluetooth enabled mobile device is configured to attach a user identifier [to the obtained

10  data]."  Dkt. No. 19-5 (Vijh Expert Report) ¶ 126.  While the report states that "the processor is

11  controlled such that it attaches a user identifier to the obtained new data," it does not explain how

12  this is performed.  Vijh bases this conclusion on "the code referenced in Element 2.I of Claim 2 of

13  the '847 Patent," but again, Vijh does not explain how the source code demonstrates that the

14  mobile device performs the claimed function.  Because Vijh's opinions do not explain how he

15  reaches his conclusions of infringement, they cannot support a jury's verdict.  *See Brooke Grp.*

16  *Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion

17  is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record

18  facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

19  Aside from Vijh's unsupported expert opinion, Cellspin offers three excerpts of Nike source code

20  without explanation as to how the mobile device performs the "attaching" or "applying" as

21  claimed by the '752 or '794 patents.  Dkt. Nos. 205-23, 205-35, 205-36.

22        Accordingly, the Court grants Nike's motion as to this ground.

23               b.    *'847 Patent*

24                     i.    "first processor"[24]

25        The claims of the asserted '847 system patent recite "a first processor" "configured to"

26  perform three steps:  (1) "acquire new-data," (2) "store the acquired new-data," and (3) "send an

27  ─────────────

28        [24] This is the same issue as in *Fitbit*, *see supra* Section III.A.5.a, and *Garmin*, *see infra*
    Section III.E.4.a.

United States District Court
Northern District of California

event notification." '847 patent at 12:27-41.  Nike moves for summary judgment of non-infringement on the ground that Cellspin cannot demonstrate how the Apple Nike Watch Series 5 contains a "first processor" claimed by the '847 patent.  For the reasons below, the Court agrees.

First, because Cellspin never took discovery from Apple, there is no evidence as to the source code or operation of the accused Apple Watch Series 5.  The only evidence as to the Watch's operation is an Apple user manual identifying an "S5" processor.  *See* Dkt. No. 198-20 (Cellspin '847 patent infringement contentions charting the accused Apple Watch Series 5) at 18 (identifying "S5 64-bit dual core processor").  This document alone is not sufficient evidence to raise a genuine dispute of material fact as to the "first processor" limitation because it neither indicates performance of the functions or that it is the only processor operating the Watch.  Moreover, aside from the manual, everything else Cellspin offers is speculation.  For example, Cellspin's expert testified in his deposition that he "would *expect* an Apple Watch to have an application processor and a Bluetooth chip" and that a Bluetooth chip "work[s] with the application processor and the base band processor to communicate via Bluetooth."  Dkt. No. 198-10 (Vijh Depo. Tr.) at 117:13-118:1 (emphasis supplied).

Second, rather than explain how the source code or accused Watch meets the asserted limitations, Vijh's report offers only conclusory opinions that because the accused Watch Series 5 performs certain functions (*e.g.*, storing new data), a single "first processor" operating the Watch necessarily performs them all.  *See* Dkt. No. 198-5 (Vijh Expert Report) ¶¶ 86, 90-93.  Yet there is no explanation how the source code of the mobile application indicates that the Apple Watch performs the recited functions, let alone how they are all performed by a single "first processor."  Instead, each of the paragraphs in Vijh's report to which Cellspin cites is unsupported conclusory opinion that the Apple Watch Series 5 contains the recited "first processor."

Third, to rebut Nike's contention that the accused Apple Watch operates multiple processors, Cellspin asserts that Vijh relied "on standard computer system architecture and the exemplary Apple S5 Processor" to identify the claimed "first processor."  Dkt. No. 204 at 20.  However, Vijh's report never mentions this basis for any of his opinions – and never discusses the S5 processor identified in the Apple user manual.  Instead, Cellspin makes this generalized

1    "standard computer system architecture" opinion without any citation to the record or expert

2    testimony and is thus unsupported attorney argument.  *See Invitrogen Corp.*, 429 F.3d at 1068

3    ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute

4    for competent, substantiated expert testimony.  It does not, and cannot, support [a party's] burden

5    on summary judgment.").

6           Because Cellspin's evidence does not create a triable dispute of material fact that a single

7    "first processor" performs the functions recited by the '847 patent, Nike's motion is granted as to

8    the '847 patent.

9                             ii.      "second processor"[25]

10          Claim 1 of the '847 patent requires a "second processor" located in the Bluetooth enabled

11   cellular phone that:  (1) detects and receives the new data, (2) listens for the event notification, (3)

12   receives the event notification and the new data, (4) stores the new data, and (5) uses HTTP to

13   transfer the new data from the Bluetooth enabled cellular phone to a website.  *See* '847 patent at

14   12:45-67.  Nike moves for summary judgment on the ground that Cellspin has failed to identify

15   and demonstrate that a single "second processor" in a Bluetooth enabled cellular phone performs

16   the five functions claimed by the '847 patent.

17          In much the same fashion as the "first processor" argument above, *see supra* Section

18   III.B.2.b.ii, Cellspin argues it does not need third-party discovery from Apple to demonstrate a

19   genuine dispute of material fact that an operating iPhone contains a single processor performing

20   the five unrelated functions claimed in the '847 patent.  It contends that infringement can instead

21   be found from the source code of the accused mobile application.  Cellspin offers its expert Vijh's

22   testimony "that a processor is necessarily required in order for the Accused Mobile Application to

23   execute."  Dkt. No. 204 at 21.  Using the Nike mobile application source code, Cellspin continues,

24   "Mr. Vijh has explained . . . how the code is executed by the processor to perform the recited

25   functions."  *Id.*  This conclusory assertion is again offered with lengthy string cites and no

26   explanation.  This evidence is insufficient because it does not explain how the code (let alone the

27

28          [25] This is the same issue contested in *Garmin.  See infra* Section III.E.4.b.

United States District Court
Northern District of California

processor) performs the recited functions.  Cellspin cannot simply cite to swaths of documents without explanation in expectation that the Court will analyze them to identify a triable issue of material fact.  *See Biotec Biologische Naturverpackungen GmbH & Co. KG*, 249 F.3d at 1353 ("It is not the trial judge's burden to search through lengthy technologic documents for possible evidence."); *see also Keenan*, 91 F.3d at 1279 (district court is not obligated "to scour the record in search of a genuine issue of triable fact").  Further, Cellspin contends that "Mr. Vijh has testified that iPhone devices contain a single processor in the form of an Apple APL1W01 A14 Bionic System on Chip."  *Id.* at 22.  In support, Cellspin offers two documents from the *Garmin* litigation.  Dkt. Nos. 204-12, 204-13.  This is flatly improper because neither of these documents were ever produced to Nike.  However, even if these documents were produced in this litigation, the Court concludes that they do not support the assertion that the "iPhone devices contain a single processor" because they do not indicate that the operating iPhone only contain a single processor let alone a single processor performing the recited functions.

Accordingly, the Court concludes that Cellspin does not show that there is a triable dispute of material fact that a single "second processor" performs the recited claims of the asserted patents.  Nike's motion is granted as to this ground.

### 3.    Internal Testing Theory[26]

Nike moves for summary judgment on Cellspin's "internal testing" theory of divided infringement, which asserts that Nike infringes the asserted patents by "extensively test[ing] its products."  Dkt. No. 204 at 26.

Cellspin supports its theory with a paragraph from Vijh's report, Dkt. No. 198-5 (Vijh Expert Report) ¶ 226, deposition testimony from three Nike 30(b)(6) witnesses, Dkt. Nos. 205-32, 205-34, 205-44, and a Nike testing protocol, Dkt. No. 205-14.  However, Cellspin "fail[s] to . . . explain how those documents support its infringement theory."  *Traxcell*, 15 F.4th at 1133 (affirming grant of summary judgment of non-infringement where the patent owner "cited swaths

---

[26] This is the same issue contested in *Fitbit, see supra* Section III.A.1.d, *Garmin*, *see infra* Section III.E.1.d, and *Fossil*, *see infra* Section III.D.1.b.i.

United States District Court
Northern District of California

of documents" but "failed to link those documents to the [accused product] or to explain how those documents support its infringement theory"). Cellspin does not show that there is a triable dispute of material fact that Nike's "extensive[] testing" performs the recited claims of the asserted patents  because its arguments "amount[] to 'conclusory statement[s] . . . without any analysis to support' them." *Id.* at 1130.  There is no explanation how Cellspin's evidence indicates performance of the claims, much less in the order required by the Court's construction.  *See E-Pass*, 473 F.3d at 1222 (affirming summary judgment of non-infringement where patentee lacked proof that all claimed method steps were performed in order).

Nike's motion is granted as to this ground.

### 4.    Assembly Theory[27]

Cellspin contends that "an assembly of the Accused Instrumentalities directly infringes the Asserted System Claims of the '847 Patent."  Dkt. No. 204 at 26.  As support, Cellspin offers 25 paragraphs of Vijh's report and an entire 135-page claim chart – none of which mention this theory.  Even so, Cellspin fails to raise a genuine dispute of material fact that an assembly infringes the asserted system claims because it offers evidence without any explanation how any element of the asserted claims is met.  *See Traxcell*, 15 F.4th at 1133 (affirming district court grant of summary judgment of non-infringement where patentee "cited swaths of documents . . . [b]ut failed to . . . explain how those documents support its infringement theory").

Nike's motion is granted as to this theory.

### 5.    Divided Infringement

#### a.    *"Directs or Controls" Theory*[28]

Nike moves for summary judgment on Cellspin's divided infringement theory that Nike is responsible for its end users' performance of method steps where Nike "directs or controls" the end users' performance.

---

[27] This is the same issue contested in *Fossil*, *see infra* Section III.D.1.b.iv, and *Garmin*, *see infra* Section III.E.1.e.

[28] This is the same issue contested in *Fitbit*, *see supra* Section III.A.2.b, *Fossil*, *see infra* Section III.D.1.b.iii, and *Garmin*, *see infra* Section III.E.1.d.

1    "[A]n entity [is] responsible for others' performance of method steps in two sets of

2    circumstances:  (1) where that entity directs or controls others' performance, and (2) where the

3    actors form a joint enterprise."  *Akamai*, 797 F.3d at 1022.  Under the "directs or controls" theory

4    Cellspin asserts here,[29] "liability . . . can [] be found when an alleged infringer conditions

5    participation in an activity or receipt of a benefit upon performance of a step or steps of a patented

6    method and establishes the manner or timing of that performance."  *Id.* at 1023.

7        Cellspin argues that Nike is liable for its end users' performance of the steps of the

8    asserted method claims because Nike conditions the benefits of "effortlessly transferring personal

9    fitness data" between the Nike accused products and a mobile device or Internet upon the

10   performance of the asserted method steps.  Dkt. No. 204 at 26-27.  For support, Cellspin offers

11   Vijh's expert testimony, three documents, and Nike's 30(b)(6) witness testimony.  *Id.* (citing Dkt.

12   No. 198-5 (Vijh Expert Report); Dkt. No. 204-4; Dkt. No. 204-7; Dkt. No. 204-14; 205-32; 205-

13   44).  However, this evidence is not offered with any explanation how it raises a genuine dispute of

14   material fact that Nike conditions a benefit upon performance of claimed method steps.  Indeed,

15   Vijh never provides an opinion on Nike's facts, only an opinion defining one of "the benefits of

16   the claimed *inventions* [a]s the ease of use and the ability to seamlessly and effortlessly transfer

17   data."  Dkt. No. 199-8 (Vijh Expert Report) ¶ 51.

18       Viewing the record evidence in the light most favorable to Cellspin, the Court concludes

19   that reasonable jurors could not conclude that Nike "conditions" its end users' "effortless[]

20   transfer [of] personal fitness data" on its end users' performance of the claimed method steps.

21                    *       *       *

22       Accordingly, Nike's motion for summary judgment of non-infringement is granted as to

23   the Apple Watch Nike products.[30]

24   //

25

26       [29] Cellspin's opposition brief does not address a "joint enterprise" theory.

27       [30] The Court does not reach Cellspin's direct or indirect infringement allegations against
     the non-analyzed Apple Watch Nike products because it grants summary judgment for non-
28   infringement as to the analyzed Apple Watch Nike Series 5.

1    //

2    //

3    **C.    *Cellspin Soft, Inc. v. Under Armour, Inc.* (17-5932)**

4    Cellspin has accused 30 Under Armour products of infringing the asserted patents.

5    Cellspin and its expert Rahul Vijh analyze two Under Armour products as representative of the

6    accused products:  (1) the HOVR Sonic 3 shoe ("HOVR 3") and (2) the Samsung Galaxy Watch

7    Active2 UA Edition 40mm ("Samsung Galaxy Watch").  Under Armour moves for summary

8    judgment of non-infringement.  Dkt. No. 170.[31]  The Court examines each.

9         **1.    HOVR 3**

10             **a.    "establishing" a "paired Bluetooth connection"[32]**

11    Each of the asserted patents recites the "establish[ment]" of a "paired Bluetooth wireless

12    connection between the Bluetooth enabled data capture device and a Bluetooth enabled cellular

13    phone [or mobile device]."  '794 patent at 11:56-58 (claim 1); *id.* at 14:21-23 (claim 16); '752

14    patent at 11:52-56 (claim 1); *id.* at 13:60-64 (claim 12); '847 patent at 12:17-25.  The Court

15    construed "paired" connection to require a connection be "in the condition of having an exchanged

16    link key (either before connection establishment was requested or during connecting phase)."  Dkt.

17    No. 133 at 17.

18    Under Armour seeks summary judgment of non-infringement on the ground that there is

19    no genuine issue of material fact the accused HOVR 3 does not "exchange[]" a "link key" as

20    construed by the Court.  Under Armour argues that the HOVR 3 instead operates in a Bluetooth

21    mode *without* pairing or security.  Dkt. No. 170 at 19.  In support, Under Armour offers a

22    Bluetooth Low Energy specification sheet indicating that a device operating at Mode 1, Level 1

23    has the following security level:  "No security (No authentication and no encryption)."  Dkt. No.

24    170-27 at 5.  Under Armour adds the testimony of its expert Dr. Jacob Sharony, who states that

25    "[s]ince Security Mode 1 Level 1 has no security, no pairing occurs or takes place if a BLE device

26

27         [31] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Under Armour, Inc.*, No. 4:17-CV-5932 (N.D. Cal.).

28         [32] This is the same issue contested in *Nikon.  See infra* Section III.E.3.a.

United States District Court
Northern District of California

1    uses Security Mode 1 Level 1."  Dkt. No. 170-23 (Sharony Expert Report) ¶ 90.

2         Cellspin disputes that the HOVR 3 only operates at Mode 1, Level 1, claiming that "Mr.

3    Vijh identifies the Source Code instructions evidencing the Bluetooth authentication configuration

4    function as part of the pairing process in the capture device code."  Dkt. No. 175 at 13 (citing Dkt.

5    Nos. 176-3, 176-4, 176-5).  However, Cellspin does not cite to where in Vijh's report he identifies

6    this source code, let alone how the code constitutes evidence of infringement in the code.

7         Under Armour further states that the HOVR 3 does not use any optional pairing feature to

8    establish a Bluetooth connection in "the condition of having an exchanged link key."[33]  In support,

9    Under Armour offers Dr. Sharony's testimony relaying a conversation with an Under Armour

10   engineer that the HOVR 3 does not have this pairing option.  Dkt. No. 171-2 (Sharony Expert

11   Report, Part II) at 37[34] ("Mr. Green explained to me that the HOVR Sonic 3 and Accused Mobile

12   Applications are not designed to not implement any Bluetooth security."); *id.* at 38 ("Mr. Green

13   explained to me that the [sic] for their connections, the HOVR Sonic 3 and Accused Mobile

14   Applications do not implement any other features for security, authentication, or encryption of a

15   connection between the HOVR Sonic 3 and Accused Mobile Applications.  Mr. Green provided

16   the same explanation for Atlas 2.0.  Mr. Green explained to me that the HOVR Sonic 3 and

17   Accused Mobile Applications do not use a link key (or Long Term Key) for connections between

18   them."). Dr. Sharony further testifies that "Security Manager Protocol" – a protocol that devices

19   operating on Bluetooth Low Energy connection use to pair – is not "invoked or implemented by

20   the HOVIR Sonic 3."  *Id.* at 35.  Dr. Sharony testifies that he also searched the source code for all

21   "application layer files" responsible for implementing the features of the Bluetooth chip in the

22   HOVR 3 and found no "BLESMP_ConfirmPairing" functions.  *Id.* at 47.  Dr. Sharony concludes

23   this indicates that "the HOVR Sonic 3 (Atlas 2.5) and Atlas 2.0 does not invoke any optional

24   functionality in the Bluetooth chip to accept a pairing request or otherwise establish a connection

25   _____

26        [33] Cellspin does not dispute that a paired Bluetooth connection using a link key is an optional feature in Bluetooth low energy.  *See* Dkt. No. 179-1 (Under Armour Response to

27   Material Facts) at 2.

28        [34] Part II of the Sharony Report contains a numbering error where it jumps back to paragraph 111 after paragraph 140.  *See* Dkt. No. 171-2 (Sharony Expert Report, Part II) at 49.

United States District Court
Northern District of California

in the condition of having an exchanged link key." *Id.*  Dr. Sharony's source code review "confirm[s] that the HOVR Sonic 3 and Atlas 2.0 do not implement a security model, authentication, or encryption and therefore they cannot establish a paired connection in the condition of having an exchanged link key (or Long Term Key)." *Id.* at 39.  Finally, Under Armour offers Dr. Sharony's testimony that he tested the actual connection between the HOVR 3 and mobile devices running the accused mobile apps.  Dkt. No. 171-2 (Sharony Expert Report, Part II) at 49 (Dr. Sharony ran "packet captures (logging and sniffing)" – a technique to detect and observe data flowing across a Bluetooth connection – and "confirm[ed] that Bluetooth's Security Manager Protocol is not invoked, such that no security, no encryption, and no authentication can be used with HOVR Sonic 3 and therefore that the HOVR Sonic 3 in conjunction with a mobile device cannot establish a connection in the condition of having an exchanged link key").

Cellspin also argues that the HOVR 3 does "pair in an infringing manner by exchanging link keys during the connection phase."  Dkt. No. 175 at 10.  In support, Cellspin points to Vijh's testimony, *id.* at Dkt. No. 170-13 (Vijh Expert Report) ¶¶ 88, 111), but he only observes that the HOVR 3 uses "either" Bluetooth LE Legacy or LE Secure connections pairing –  Vijh never explains which – and that "both methods . . . typically use cryptographic link keys."  Dkt. No. 170-13 (Vijh Expert Report) ¶ 88; Dkt. No. 175 at 15 ("As such, as long as there remains the condition of having an exchanged link key, the element is satisfied.").  Based on this, Vijh concludes that the HOVR 3 pairs "in the condition of having an exchanged link key" as required by the Court.  This conclusion presumes that the HOVR 3 uses link keys simply because it operates with a Bluetooth connection that "typically use[s] cryptographic link keys."  The fact that a device with a certain Bluetooth connection might "typically" have certain characteristics is insufficient to prove the HOVR 3 does – especially given Under Armour's evidence otherwise.

Vijh continues in his report that "in my personal review of the materials available to me, including the source code made available to me by Defendant, I was able to locate evidence of 'pairing.'"  Dkt. No. 170-13 (Vijh Expert Report) ¶¶ 88, 111, 143.  However, Vijh does not explain what that evidence is or where he locates "pairing."  Cellspin cites to source code, Dkt Nos. 176-3, 176-4, 176-5, 176-6, 176-7, 176-8, which it claims are "Under Armour Source Code

United States District Court
Northern District of California

files evidencing pairing" that Vijh based his opinion on. Dkt. No. 175 at 10. Yet none of the source code is cited to with an explanation of how it works. According to Under Armour's expert testimony, three of the documents, Dkt. Nos. 176-6, 176-7, 176-8, relate to the Android version of the Map My Run application; and the HOVR3 cannot accept a pairing request from a mobile device running this app. Dkt. No. 171-2 (Sharony Expert Report, Part II) at 48.[35] Under Armour's expert also testifies that the remaining documents are "additional software development kit files" that "provide no support for [Vijh's] infringement analysis." *Id.*

Cellspin further argues that the fact that the HOVR 3 uses Bluetooth Mode 1, Level 1 does not automatically rule out that it exchanges link keys. Dkt. No. 175 at 10. "As explained by Mr. Vijh, the exchanging of link keys allows devices to remain paired even when they are out of Bluetooth range." *Id.* (quoting Dkt. 170-13 (Vijh Expert Report) ¶ 69). Yet, the cited paragraph from Vijh's expert report again offers without explanation the same conclusory opinion that the HOVR 3 performs the recited "paired." Dkt. 170-13 (Vijh Expert Report) ¶ 69. This unsupported expert opinion "cannot support a jury's verdict." *See Brooke Grp. Ltd.*, 509 U.S. at (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). Cellspin continues that "[t]he evidence of record establishes that this functionality exists in the infringing HOVR products" and cites to five technical Under Armour documents without explanation. Dkt. No. 175 at 10-11 (citing Dkt. Nos. 176-9, 176-10, 176-11, 176-12, 176-13). It is not the Court's job to "search through lengthy technologic documents for possible evidence." *Biotec Biologische Naturverpackungen GmbH & Co. KG*, 249 F.3d at 1353. Even still, the documents do not indicate that the HOVR 3 performs the claimed "establish[ment]" of a "paired Bluetooth wireless connection." As Under Armour notes, the one testing document to which Cellspin refers as a "fundamental test case[]," Dkt. No. 176-9 at 2, concerns the act of "pair[ing]" the "shoe" but never describes the exchange of link keys as required by the Court's construction.

---

[35] When the Court asked Cellspin at oral argument about this, Cellspin denied the app incompatibility without explanation. Dkt. No. 217 (Mot. Hr'g Tr.) at 71:24-72:1.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cellspin continues that "the opinions of Mr. Vijh are properly based on his review and analysis of the Source Code as produced in this case, along with his personal testing of the Accused Instrumentalities." Dkt. No. 175 at 11. Perhaps, but nowhere in Vijh's report does it offer any results from his purported testing to explain how the accused HOVR 3 performs any acts of infringement. Vijh's report only makes the bare assertion that "testing of the Accused Instrumentalities and Accused Mobile Applications confirmed they respectively operate in accordance with the Asserted Claim." Dkt. 170-13 (Vijh Expert Report) ¶¶ 88, 111, 142. Again, these unsupported opinions "cannot support a jury's verdict." *See Brooke Grp. Ltd.*, 509 U.S. at (1993).

Cellspin does not meet its evidentiary burden to show that there is a triable dispute of material fact that the HOVR 3 establishes a paired Bluetooth connection in the manner required by the Court's construction. Accordingly, Under Armour's motion is granted as to this ground.

          b.    *"secure paired Bluetooth connection" and "cryptographic encryption key"[36]*

Claim 1 of the '847 patent requires that the "Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when the first Bluetooth communication device establishes the paired Bluetooth wireless connection." '847 patent at 12:17-25. The Court has construed "cryptographically authenticate" as "verified as legitimate by use of encryption and decryption involving an algorithm." Dkt. No. 133 at 18.

Under Armour moves for summary judgment on the ground that there is no dispute of material fact the HOVR 3 does not "cryptographically authenticate." As discussed above, *see supra* Section III.C.1.a, Under Armour offers evidence and expert testimony that because the HOVR 3 operates at Bluetooth Mode 1, Level 1, it does not perform authentication.

Cellspin offers Vijh's expert report stating that "the exchanged keys (which exist via the secure pairing process) are used to authenticate." Dkt. No. 175 at 15 (citing Dkt. 170-13 (Vijh Expert Report) ¶¶ 56, 70, 89). In his report, Vijh states that the HOVR 3 operates with link keys

---

[36] This issue has been analyzed with both *Fitbit*, *see supra* Section III.A.4, and *Nikon*, *see infra* Section III.F.4.a.

because other devices "typically" use link keys, and, on this basis, concludes – without explanation – that the HOVR 3 thus "verif[ies] as legitimate by use of encryption and decryption involving an algorithm." Dkt. 170-13 (Vijh Expert Report) ¶ 89. This improperly assumes that a device's use of link keys necessarily means that a device "verif[ies] as legitimate by use of encryption and decryption involving an algorithm." Even assuming *arguendo* that such an assumption was reasonable, Cellspin's efforts fail because its conclusion requires yet another improper assumption that the HOVR 3 uses link keys – a presumption unsupported by the record. *See supra* Section III.C.1.a. (granting summary judgment because Cellspin's argument rested on the improper presumption that a device has link keys because it operates with Bluetooth connections that "typically use[s] cryptographic link keys").

Cellspin's evidence does not create a genuine dispute of material fact that the HOVR 3 performs "cryptographic[] authenticat[ion]" as construed by the Court. Accordingly, Under Armour's motion is granted as to this ground.

> ### 2. Samsung Galaxy Watch and HOVR 3
>
> #### a. "maintained on a continuous basis"

Each of the asserted patent claims require acquiring "new data," where "new data" is defined as "data acquired after the paired connection is established." '794 patent at 11:59-61 (claim 1); *id.* at 14:24-26 (claim 16); '752 patent at 11:57-59 (claim 1); *id.* at 14:1-10 (claim 12); '847 patent at 12:27-31. The Court issued a claim construction stating that the asserted claims require that "after the paired connection is established" means "after the paired connection is established and maintained on a continuous basis." Dkt. No. 133 at 13-15.

According to the patents, the concept of "paired" devices – discussed above, *see supra* Section III.C.1.a – is distinct from the idea that devices form a "connection" "established and maintained on a continuous basis." This is evident from the plain language of the Court's construction of "paired," which refers to "connection" as a separate concept: "in the condition of having an exchanged link key (either *before connection establishment was requested or during connecting phase*)." Dkt. No. 133 at 17-18 (emphasis supplied). As Under Armour's expert testifies, "Two Bluetooth enabled devices can exist in a connected state, and that state can exist

United States District Court
Northern District of California

between two paired devices or between two non-paired devices, depending on how the developer designed the devices."  Dkt. No. 170-23 (Sharony Expert Report, Part I) ¶ 106.

Under Armour moves for summary judgment of non-infringement on the ground that because the accused HOVR 3 and Samsung Galaxy Watch are Bluetooth Low Energy devices – a fact that Cellspin does not dispute, *see* Dkt. No. 179-1 (Under Armour's Response to Cellspin's Additional Material Facts) at 9-10, they are maintained on a temporary or discontinuous basis.

Under Armour offers Dr. Sharony's testimony that products operating in Bluetooth Low Energy "conserve power by shutting their radio and 'go to sleep' resulting in discontinuous connections."  Dkt. No. 171-2 (Sharony Expert Report, Part II) at 66 (¶ 144).  Dr. Sharony states that upon testing the connection interval, he found that once the phone sends a request to the HOVR 3, it a reduced interval which lowers the connection's "duty cycle," a measure of the period in which a signal or system is active, indicating a discontinuous connection.  *Id.* at 68 (¶ 148).  Dr. Sharony also testified that he captured packets between the HOVR 3 and a mobile device and verified the reduced connection interval.  *Id.* at 68 (¶ 149).  He continues that, "during this 'off' state there are no communications between the two devices because they are disconnected to save power (in sleeping mode)."  *Id.* at 69 (¶ 150).  Dr. Sharony concluded that, "it is clear that the Accused Instrumentalities and Accused Mobile Applications cannot establish and maintain their connection on a continuous basis."  *Id.* at 79 (¶ 153).

Cellspin responds by quoting at length from Vijh's expert report:

> I find that such data is designed to be captured (and is captured) and acquired by the Accused Instrumentalities "after the paired connection is established and maintained on a continuous basis," as the pertinent phrase ("after the paired connection is established") has been defined by the Court. I find that this is the typical and ordinary manner in which the Accused Instruments operate, and provides for ease of use. The Bluetooth paired connection is maintained on a continuous basis once it is established, given that it persists in a condition of having an exchanged link key.  One of the only ways to remove or break the "paired connection" is to unpair the two Bluetooth devices or remove those link keys from at least one of those two devices. Note, even when the two Bluetooth devices are no longer in range or close to each other, the 'paired connection' is still maintained because the two Bluetooth paired devices are still 'in the condition of having an exchanged link key' and maintain that link key on a continuous basis.

1    Dkt. No. 170-13 (Vijh Expert Report) ¶ 69.  Vijh never explains how or why the use of link keys

2    means that a Bluetooth connection is "maintain[ed] on a continuous basis" as required by the

3    Court's construction.  This *ipse dixit* testimony is offered without any explanation or citation to

4    the record.  *See Brooke Grp. Ltd.*, 509 U.S. at 242 ("When an expert opinion is not supported by

5    sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or

6    otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

7          Cellspin's remaining evidence fares no better:  One, Cellspin argues that a Bluetooth

8    connection is "maintained and established" because "the MapMyRun Mobile Application runs in

9    the background of the mobile device on which it is installed."  Dkt. No. 175 at 16.  However,

10   Cellspin does not explain how the background operation of this mobile app indicates that a

11   *Bluetooth connection* is maintained and established.  Cellspin's citation to Vijh's report is of no

12   help given that the report does not explain this theory either.  *See* Dkt. No. 170-13 (Vijh Expert

13   Report) ¶¶ 92, 93, 114 (relevant sections lacking explanation).  In the cited paragraphs of his

14   report, Vijh concludes that the source code "confirmed the[] [Accused instrumentalities']

15   respective operation in accordance with the Asserted Claim."  *Id.*  Vijh claims to "confirm" but

16   never explains how the source code supports this opinion.  Paragraph 92 cites to "capture device"

17   source code "show[ing] the heartrate service defining read events after pairing is established."  *Id.*

18   Yet Vijh does not explain how the act of "defining read events" confirms that new data is acquired

19   after a Bluetooth connection is maintained and established.  Paragraphs 93 and 114 offer even less

20   information, as they both cite to source code without explanation of what it indicates.

21         Two, Cellspin states that, "[r]egardless of the location of a given device (in range or out of

22   range), it is nevertheless 'connected' insofar as Bluetooth is concerned.  Devices can exist in any

23   of these states and still be in a paired connection."  Dkt. No. 175 at 17.  This is unsubstantiated

24   attorney argument that cannot create a genuine dispute of material fact because it is offered with

25   no record evidence or expert opinion.  *See Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276,

26   1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."); *see also Invitrogen*

27   *Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney

28   argument regarding the meaning of technical evidence is no substitute for competent, substantiated

1    expert testimony.  It does not, and cannot, support Clontech's burden on summary judgment.").

2          Finally, Cellspin argues that "the paired connection between the two devices is maintained

3    using link keys and is maintained as long as the link keys remain maintained, regardless of the

4    duty cycle of packets."  Dkt. No. 175 at 17.  In support, Cellspin broadly cites to Bluetooth

5    specification excerpts, Dkt. Nos. 175-6, 175-7, 175-8, but does not offer any explanation how the

6    excerpts support its contention that the accused products operate on a Bluetooth connection that is

7    maintained on a continuous basis.

8          In summary, Cellspin offers Vijh's unsupported conclusions and evidence with no

9    explanation how the accused representative products operate with a Bluetooth connection that is

10   established and maintained on a continuous basis.  *See Ferring B.V.*, 437 F.3d at 1193

11   ("Conclusory allegations and attorney arguments are insufficient to overcome a motion for

12   summary judgment." (citation omitted)).  The Court grants Under Armour's motion as to this

13   ground.

14                              *          *          *

15         For the reasons above, Under Armour's motion for summary judgment is granted.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

United States District Court
Northern District of California

1    //

2    //

3    **D.** *Cellspin Soft, Inc. v. Fossil Group, Inc.* **(17-5933)**

4    Cellspin has accused 68 Fossil products of infringing the asserted patents.  Cellspin and its

5    expert Rahul Vijh analyze five accused products as representative of all accused products.  Three

6    representative products run Google's Wear OS operating system (the "Wear OS products") which

7    communicates with the Google Wear OS mobile application ("Google App") on either iOS or

8    Android.  The other two representative products are hybrid smartwatches with heart rate sensors

9    ("Fossil HR Hybrids") that communicate with the Fossil Hybrid Smartwatch app.  Fossil moves

10   for summary judgment of non-infringement.  Dkt. No. 265.[37]  The Court begins with the Wear OS

11   Products, then the Fossil HR Hybrids.

12              *1.    Wear OS Products*

13                   *a.    Discovery from Google*

14   Fossil contends that its Wear OS products communicate with a Google App and that Fossil

15   does not have any hardware or software on the corresponding mobile device.  Based thereon,

16   Fossil argues that Cellspin has no evidence to support its allegations about third-party phones

17   running the Google App because Cellspin did not seek any discovery from non-party Google.

18   Cellspin responds that no evidence was needed from Google because "[a]s explained by

19   Mr. Vijh, all steps in the Asserted Method Claims are directly performed by Fossil's software."

20   Dkt. No. 284 at 10.  Cellspin continues that, "with respect to Claim 1 of the '752 Patent, the

21   referenced mobile device needs merely be 'configured to' perform the recited functions."  *Id.*  In

22   support, Cellspin cites to paragraphs 112-226 of Vijh's report with the parenthetical "after full

23   review and discussion, concluding that each individual 'element is met by the Accused

24   Instrumentalities."  *Id.*  Cellspin cannot meet its summary judgment burden by generically citing

25   to 125 paragraphs of Vijh's report with the conclusory assertion that "all steps" of the asserted

26   patents are "directly performed by Fossil's software."  Cellspin must instead "identify with

27   _____

28       [37] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Fossil Group, Inc.*, No. 4:17-CV-5933 (N.D. Cal.).

United States District Court
Northern District of California

1    reasonable particularity the evidence that precludes summary judgment."  *See, e.g.*, *Keenan*, 91

2    F.3d at 1279 (district court is not obligated "to scour the record in search of a genuine issue of

3    triable fact").

4         At any rate, Cellspin's opposition and expert report both admit that certain functions

5    claimed in the asserted patents are performed by the source code of the accused mobile

6    application, and not the source code of the Fossil Wear OS products.  Regarding the

7    "cryptographic encryption key" limitation claimed by claims 1, '752 patent at 12:24-25, and 12 of

8    the '752 patent, *id.* at 13:63-64, Cellspin states that "Mr. Vijh explains that it is the code

9    (executable instructions) of the Accused Mobile Applications which configures the generic

10   processors to perform the recited functionality."  Dkt. No. 284 at 10 (citing Dkt. No. 265-6 (Vijh

11   Expert Report) ¶ 129 ("Again, in my opinion, and as discussed above, the Accused Mobile

12   Applications each plainly and necessarily include code (executable instructions) which is executed

13   by the processor of the mobile device on which the Accused Mobile Application is installed.")).

14   As Fossil points out, the problem with this is that the accused "code" is not Fossil code.  Because

15   the accused mobile application is a Google application, it is Google's code.  Cellspin does not

16   dispute this.  *See* Dkt. No. 284-2 (Cellspin's Responsive Separate Statement) at 2 ("For Wear OS

17   products that communicate with a Google App, Fossil does not have hardware or software on the

18   corresponding mobile device (the mobile application is the Google App, which is a Google

19   product).").  Cellspin concedes this again with respect to the "attach a user identifier" limitation in

20   claim 1 of the '752 patent.  *See* Dkt. No. 284 at 11 ("Mr. Vijh explains that the code of the

21   *Accused Mobile Applications* configures the generic processors to perform the recited

22   functionality." (emphasis supplied)).

23        Vijh's report offers similar conclusions in the form of the same blanket statement that "[i]n

24   my opinion, and as discussed above, *the Accused Mobile Applications each plainly and*

25   *necessarily include code (executable instructions)* which is executed by the processor of the

26   mobile device on which the Accused Mobile Application is installed."  *See* Dkt. No. 265-6 (Vijh

27   Expert Report) ¶¶ 98-106 (claim 1 of the '847 patent) (emphasis supplied); *id.* ¶¶ 124, 128-32

28   (claim 1 of the '752 patent); and *id.* ¶¶ 157-58 (claim 12 of the '752 patent).  The report repeats

United States District Court
Northern District of California

these conclusions for the claims of the '794 patent. *Id.* ¶ 170 (element "1.II" of claim 1 of the '794 patent) ("The Accused Mobile Applications are each programmed and designed such that they include code (executable instructions) which is executed by the processor of the mobile device on which the Accused Mobile Application is installed."); *id.* ¶ 206 (element "16.V.a" of claim 16 of the '794 patent) ("In my opinion, and based on my experience and training, and further including my review of the materials available to me, including the source code as was made available to me by the Defendant, the Accused Mobile Applications are configured such that they cause the processor of the mobile device to carry out 'polling' of the Accused Instrumentalities over the paired Bluetooth connection.").

In summary, Cellspin's theory – Wear OS products' software performs all of the recited functions of the claimed patents – fails because as Cellspin's opposition and expert admit, certain claimed functions are instead performed by Google's mobile application code.  Without any discovery as to how the Google application interacts, Cellspin has no evidence to prove the performance of the asserted claims, each of which contain elements requiring performance by a mobile device.  '794 patent at 12:20-24 (claim 1 reciting "applying, using the software module on the Bluetooth enabled mobile device, a user identifier to the new data for each destination web service"); *id.* at 14:46-50 (claim 16 reciting same); '752 patent at 12:25-26 (claim 1 reciting "wherein the Bluetooth enabled mobile device is configured to attach a user identifier, an action setting and a destination web address of a remote internet server to the obtained new data"); *id.* at 14:26-32 (claim 12 reciting a "Bluetooth enabled mobile device" "attaching a user identifier, an action setting and a destination web address to the obtained new data"); '847 patent at 12:42-13:3 (claim 1 reciting "a mobile application in the Bluetooth enabled cellular phone comprising executable instructions that, when executed by a second processor inside the Bluetooth enabled cellular phone controls the second processor to" perform certain functions).

Accordingly, the Court grants Fossil's motion as to the Wear OS products.

### b.    *Additional Theories*

Fossil moves for summary judgment on Cellspin's infringement theories under internal testing, assembly, customer inducement, and "direction and control."  For the reasons below, each

1    of Cellspin's theories fails for a lack of genuine dispute of material fact.

2                        i.        Internal Testing Theory[38]

3           First, Cellspin argues that Fossil infringes through its "internal product testing."  Dkt. No.

4    284 at 13-14.  In support, Cellspin cites to a paragraph from Vijh's expert report stating that

5    "[a]dditional materials support the conclusion that Defendant instructs and encourages users to

6    perform the acts which, in my opinion, constitute infringement."  Dkt. No. 265-6 (Vijh Expert

7    Report) ¶ 231.  In that paragraph, Vijh lists off a series of materials without explanation how they

8    support the conclusion and concludes that "it is evident from the materials I have reviewed that the

9    Defendant itself makes and uses the inventions, including as part of its test protocols."  *Id.*  This

10   cannot overcome a motion for summary judgment.  *See Dynacore Holdings*, 363 F.3d at 1278 ("It

11   is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is

12   insufficient to raise a genuine issue of material fact[.]").

13          In addition to its expert's opinion, Cellspin adds a string cite of documents with no

14   explanation how they raise a genuine dispute of material fact as to performance of the recited

15   claims, much less in the order required by the Court's construction.  *See E-Pass*, 473 F.3d at 1222

16   (affirming summary judgment of non-infringement where patentee lacked proof that all claimed

17   method steps were performed in order).

18          Accordingly, Fossil's motion is granted as to this theory.

19                        ii.       Inducement Theory[39]

20          Second, Cellspin asserts that Fossil induces its customers to perform all steps of the

21   claimed '752 and '794 method patents when they assemble and use the infringing system as

22   instructed by Fossil.  Dkt. No. 284 at 14-15.  Cellspin claims that infringement "includes the

23   performance of the "providing a software module on the Bluetooth enabled data capture device"

24   recited by claims 1 and 16 of the '794 patent.  *See* '794 patent at 11:52-53 (claim 1); *id.* at 14:17-

25   18 (claim 16).  Even if accurate, this limitation is only one element for which Cellspin must raise a

26

27          [38] This is the same issue contested in *Fitbit*, *see supra* Section III.A.1.d, *Nike*, *see supra*
     Section III.B.3, and *Garmin*, *see infra* Section III.E.1.c.

28          [39] This is the same issue contested in *Garmin*.  *See infra* Section III.E.1.f.

United States District Court
Northern District of California

1  genuine dispute of material fact as to infringement.  As Fossil points out, Cellspin does not offer

2  any evidence showing that Fossil's customers perform the "[receiving/making] the new data

3  [available]" "at one or more web services" as recited by the '794 patent's claims.  '794 patent at

4  12:34-38 (claim 1); *id.* at 14:60-64 (claim 16).  Nor does Cellspin offer any evidence showing that

5  Fossil's customers perform the "attaching" a "user identifier" to "new data" as recited by the '752

6  patent's claims.  '752 patent at 12:17-37 (claim 1); *id.* at 14:26-32 (claim 12).

7        In summary, Cellspin does not raise a genuine dispute of material fact that Fossil's

8  customers perform all steps of the claimed method patents and thus cannot prove indirect

9  infringement of the asserted method patents.  *See Limelight Networks, Inc.*, 572 U.S. at 921

10  ("Liability for inducement must be predicated on direct infringement."); *Joy Techs., Inc.*, 6 F.3d at

11  774 ("Liability for either active inducement of infringement or contributory infringement is

12  dependent upon the existence of direct infringement.").

13        Accordingly, Fossil's motion is granted as to this theory.

14            iii.    "Directs or Controls" Theory[40]

15        Third, Fossil moves for summary judgment as to Cellspin's theory that Fossil is liable for

16  Google's actions because Google operates under Fossil's "direction and control."[41]

17        "[A]n entity [is] responsible for others' performance of method steps in two sets of

18  circumstances:  (1) where that entity directs or controls others' performance, and (2) where the

19  actors form a joint enterprise."  *Akamai*, 797 F.3d at 1022.  Under the "directs or controls" theory,

20  "liability . . . can also be found when an alleged infringer conditions participation in an activity or

21  receipt of a benefit upon performance of a step or steps of a patented method and establishes the

22  manner or timing of that performance."  *Id.* at 1023.

23        Fossil asserts that Cellspin cannot allege a theory of "direction and control" without also

24  asserting the theory over Google because certain claim elements require the performance by a

25  _____

26  [40] This is the same issue contested in *Fitbit, see supra* Section III.A.2.b, *Nike*, *see supra*
Section III.B.5.a, and *Garmin*, *see infra* Section III.E.1.d.

27  [41] In its opposition brief, Cellspin explains that "[t]o the extent Fossil addresses the
question of joint enterprise liability in its Motion, Plaintiff does not affirmatively assert that theory
28  here."  Dkt. No. 284 at 17.

mobile phone and Google – not Fossil – is responsible for source code on the mobile phone.  The

Court agrees.  Fossil's "direction and control" theory fails because liability must also include

alleged actions for which Google is responsible and Cellspin "does not mention 'Google' under

any theory of inducement or indirect infringement in its Infringement Contentions."  *See* Dkt. No.

284-2 (Cellspin's Responsive Separate Statement) at 3 (Fact 6).

Accordingly, Fossil's motion is granted as to this theory.

<div align="center">iv.   <u>Assembly Theory</u>[42]</div>

Fourth, Cellspin contends that "an assembly of the Accused Instrumentalities directly

infringes the Asserted System Claims of the '847 Patent."  Dkt. No. 284 at 13.  As support,

Cellspin generically offers 25 paragraphs of Vijh's expert report and an entire 692-page claim

chart – none of which mention this theory.  Even so, Cellspin does not raise a genuine dispute of

material fact that an assembly infringes the asserted system claims because its evidence is

provided with no explanation how any element of the asserted claims is met.  *See Traxcell*, 15

F.4th at 1133 (affirming district court grant of summary judgment of non-infringement where

patentee "cited swaths of documents . . . [b]ut failed to . . . explain how those documents support

its infringement theory").

Accordingly, Fossil's motion is granted as to this theory.

<div align="center">v.   <u>Google Mobile App</u></div>

Finally, to function, Fossil Wear OS Product must communicate with the Google App.

The particular version of the Google App depends on the phone operating the App:  the iOS

Google App for an iPhone and the Android Google App for an Android phone.  Fossil moves for

summary judgment of non-infringement on both versions.

Fossil seeks summary judgment on the iOS Google App because Cellspin did not identify

it as an accused product in its infringement contentions.  Cellspin's infringement charts for the

Wear OS products identify the Android Google App as an accused "Fossil Mobile Application."

*See, e.g.*, Dkt. No. 265-7 at 216 (identifying "Wear OS by Google for Android" as an accused

---

[42] This is the same issue contested in *Nike*, *see supra* Section III.B.4, and *Garmin*, *see infra* Section III.E.1.e.

<div style="writing-mode: vertical">United States District Court<br/>Northern District of California</div>

"Fossil Mobile Application").  None of these contentions identify the iOS Google App by name.
Likewise, while Cellspin's expert report identifies the Android Google App among the "Accused
Mobile Applications," it does not identify the iOS Google App.  *See* Dkt. No. 284-2 (Cellspin's
Responsive Separate Statement) at 3 (Facts 7, 8).

Cellspin argues that it disclosed the iOS Google App where its infringement charts state:

> [T]he Fossil Mobile Application comprises at least an Android and
> iOS version, and any references herein to the Fossil Mobile
> Application are to both the exemplary Android version and the iOS
> version, including because Cellspin contends that all iterations of the
> Fossil Android Mobile Application and/or Fossil iOS Mobile
> Application, which Cellspin contends have the same relevant
> functionality.

Dkt. No. 284 at 18 (quoting Dkt. No. 265-7 at 46).  However, the accused mobile app is not a
"Fossil Mobile Application," but a *Google* mobile app.  Given this distinction, along with the fact
that both the infringement contentions and the expert report identify the Android Google App but
neither identify the iOS Google App, the Court concludes that Cellspin's disclosure does not
constitute sufficient notice of the iOS Google App.

Next, Fossil moves for summary judgment as to the Android Google App on the ground
that Cellspin's Android Google App theories deal with Bluetooth Classic and a "purported
proprietary implementation of event notifications" which it argues were not previously disclosed
in the case.  Dkt. No. 265 at 13.

Cellspin argues that these theories are not new because it "never limited its infringement
theory to any specific version of the Bluetooth standard."  Dkt. No. 284 at 19.  This is incorrect.
Cellspin's infringement contentions repeatedly identify Bluetooth Low Energy, a wireless
connection protocol separate and distinct from Bluetooth Classic.  Dkt. No. 292 at 7.  Indeed,
where Cellspin claims its contentions "consistently identified characteristic and handle values as
the means by which Fossil infringes the Asserted Claims," Dkt. No. 284 at 19, these disclosures
only referenced Bluetooth Low Energy.  *See* Dkt. No. 265-7 at 81-82 ("The Fossil Gen 5
Wearable sends event notifications, including via the Bluetooth protocol, including via Bluetooth
4.0 (Low Energy / LE / Smart) or later, to the Bluetooth enabled mobile device.").  This limitation
is further confirmed by reference to Cellspin's expert report, which describes the use of Bluetooth

1    LE, but never Bluetooth Classic.  *See, e.g.*, Dkt. No. 265-6 (Vijh Expert Report) ¶ 97 ("Bluetooth

2    LE devices use Event Notification for various characteristics to send a signal/event notification to

3    tell the mobile device about the new data the device has acquired.").

4         Thus, given that Cellspin's disclosures and expert report did not disclose Bluetooth Classic

5    and instead referenced the Bluetooth Low Energy technology, the Court concludes that Cellspin

6    did not properly disclose its Bluetooth Classic theory.  Cellspin's remaining arguments that

7    Bluetooth Classic was disclosed because of the generalized subject matter of the asserted patents

8    or through a passing reference to the Court's claim construction order do not overcome this

9    conclusion.  At this stage in patent litigation, a more exacting analysis of the specifics of the

10   technology is required.  Broad generalizations are insufficient.

11        Accordingly, Fossil's motion is granted as to both versions of the Google App.

12        ### 2.    *Fossil HR Hybrids*

13        #### a.    *"cryptographically authenticate"*[43]

14        Claim 1 of the '847 patent requires that the "Bluetooth enabled data capture device is

15   configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when

16   the first Bluetooth communication device establishes the paired Bluetooth wireless connection."

17   '847 patent at 12:17-25.  The Court has construed "cryptographically authenticated" as "verified

18   as legitimate by use of encryption and decryption involving an algorithm."  Dkt. No. 230 at 18.

19        Fossil argues that its accused Fossil HR Hybrid products do not "cryptographically

20   authenticate" because they use a Bluetooth pairing method called "Just Works" which they argue

21   does not perform authentication.  Dkt. No. 265 at 13.  Cellspin's infringement contention charts

22   repeatedly cite a Bluetooth Low Energy ("LE") Security information sheet explaining that Just

23   Works operates in one of two pairing modes, LE Legacy Connections and LE Secure Connections.

24   *See* Dkt. No. 265-13 at 25-26, 41-42, 173-74, 188-89, 319-20, 336-37, 461-62, 477-78, 595-96,

25   609-10.  According to this document, neither pairing mode "verifies" the devices taking part in the

26   connection.  For LE Legacy Connections, the document explains:

27

28        _____

         [43] This is the same issue contested in *Under Armour*, *see supra* Section III.C.1.b, and
         *Nikon*, *see infra* Section III.F.4.a.

United States District Court
Northern District of California

1

2

3

> In this method, the TK [Temporary Key] is set to 0. Thus, it is very easy for an attacker to brute force the STK [Short Term Key] and eavesdrop on the connection. Likewise, *this method also offers no way of verifying the devices taking part in the connection* and thus it offers no MITM [Man in the Middle] protection.

4

*Id.* at 25 (emphasis supplied). For LE Secure Connections, it provides:

5

6

7

8

> By virtue of the ECDH key exchange, the Just Works™ pairing method in LE Secure Connections has substantially more resilience to passive eavesdropping compared to the same method in LE Legacy Connections. However, since *this method does not give the user a way to verify the authenticity of the connection*, it is still vulnerable to MITM attacks.

9

10

*Id.* at 26 (emphasis supplied). Fossil argues that because neither Bluetooth connection verifies the devices paired in a Bluetooth connection, Cellspin cannot prove its products perform the claimed "cryptographic authentication."

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Cellspin does not dispute that Fossil HR Hybrids use "Just Works." *See* Dkt. No. 284-2 (Cellspin's Responsive Separate Statement) at 5-6. Rather, Cellspin argues that using "Just Works" does not necessarily mean that Fossil HR Hybrids do not perform authentication. According to Vijh, the Fossil HR Hybrids perform authentication because both LE Legacy and LE Secure pairing use "cryptographic keys for authentication." Dkt. No. 265-6 (Vijh Expert Report) ¶ 56; *see* Dkt. No. 265-10 (Vijh Depo. Tr.) at 176:24-177:10 (testifying that either pairing method infringes because each method "is used to exchange link keys"). Cellspin cites six source code documents (Dkt. Nos. 265-3, 265-7, 265-8, 265-9, 265-10, 265-33) and its infringement contentions as "evidence of secure connections." Dkt. No. 284 at 20. However, upon review and analysis, the Court finds that neither Cellspin's opposition nor Vijh's report explains how the cited source code indicates the use of link keys, much less the performance of cryptographic authentication. Dkt. No. 265-6 (Vijh Expert Report) ¶ 91 ("[E]ach of the Accused Instrumentalities used either Bluetooth LE Legacy Connection Pairing or Bluetooth LE Secure Connections Pairing. Both methods of Bluetooth pairing typically use cryptographic link keys."); *id.* ¶ 115 ("[T]he Accused Instrumentality is configured such that it uses cryptographic encryption keys, including by exchanging cryptographic keys.").

27

28

Vijh's conclusions rely on the unfounded assumptions that (1) the accused

*United States District Court*
*Northern District of California*

55

1    instrumentalities use either LE Legacy or LE Secure Bluetooth connections – Vijh never identifies

2    which; (2) both LE Legacy or LE Secure Bluetooth connections necessarily use link or

3    cryptographic keys; and (3) use of cryptographic keys means that a product performs the recited

4    "verify as legitimate by use of encryption and decryption involving an algorithm."  Importantly,

5    the Vijh Report does not state that both Bluetooth connections use link keys; it only states that

6    "[b]oth methods of Bluetooth pairing *typically* use cryptographic link keys."  Dkt. No. 265-6 (Vijh

7    Expert Report) ¶ 91 (emphasis supplied); *see also* Dkt. No. 284 at 20 ("even Legacy Pairing

8    *typically* uses cryptographic link keys").

9         In summary, Cellspin's expert testimony makes assumptions unsupported by the evidence

10   and is thus a conclusory assertion insufficient to raise a genuine issue of material fact.  *See Ferring

11   B.V.*, 437 F.3d at 1193 ("Conclusory allegations and attorney arguments are insufficient to

12   overcome a motion for summary judgment." (citation omitted)).  This testimony, coupled with

13   unexplained supporting source code, is insufficient to rebut Fossil's evidence that neither

14   Bluetooth LE Legacy nor LE Secure performs the claimed "cryptographical[] authenticat[ion]."

15        Accordingly, Fossil's motion is granted.

16        b.    *"user identifier" and "user information"*[44]

17        The claims of the '752 and '794 patents require "attaching" or "applying" a "user

18   identifier" at an intermediary device and the claims of the '847 patent require that "user

19   information" be "stored" at an intermediary device before being sent "along with" new data.  '794

20   patent at 12:20-24 (claim 1); *id.* at 14:46-50 (claim 16); '752 patent at 12:17-37 (claim 1); *id.* at

21   14:26-32 (claim 12); '847 patent at 12:62-67.

22        Fossil argues that Cellspin does not provide any evidence that its accused Fossil HR

23   Hybrids perform these recited functions.  Cellspin's infringement contentions asserted that

24   Fossil's products infringed in part because Fossil's "username or email address, or information

25   based off of a user or the user's associated wearable device" could be the claimed "user identifier"

26   or "user information."  *See* Dkt. No. 265-11 at 100 ('794 patent infringement contentions); Dkt.

27   _____

28        [44] This is similar to the issues contested in *Fitbit*, *see supra* Section III.A.3, and *Nike*, *see supra* Section III.B.2.a.

United States District Court
Northern District of California

No. 265-12 at 129 ('752 patent infringement contentions); Dkt. No. 265-13 at 93 ('847 patent infringement contentions).  Rather than offer evidence that a username or email address can be the claimed element, Cellspin seeks to rely on an infringement theory that "OAuth tokens" meet the claimed "user identifier" or "user information."  However, Cellspin did not disclose this theory in its infringement contentions.

Cellspin claims that its infringement contentions contained an "exemplary and non-exhaustive" disclosure that "broadly included OAuth Tokens and other derivations."  Dkt. No. 284 at 25.  It argues that "OAuth tokens" were included in the catch-all "information based off of a user or the user's associated wearable device."  This does not come close to disclosing the OAuth Token theory as required by Patent L.R. 3-1(c).  *See* Patent L.R. 3-1(c) (for each asserted limitation, infringement contentions must specifically identify "the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function").  "[I]nformation based of a user or the user's associated wearable device" did not give Fossil any reasonable notice that Cellspin intended to base its theory of infringement on the use of "OAuth tokens."  *See Illumina*, 2021 WL 4126005, at *4 ("[T]he Patent Local Rules do not require perfect clarity, only reasonable notice that is 'as specific as possible' given the information of which a plaintiff is aware." (quoting *Finjan I*, 2015 WL 3640694, at *2)).

Because Cellspin's infringement contentions did not provide reasonable notice of its OAuth token theory, the Court rejects Cellspin's attempt to introduce this theory through Vijh's expert report.  Accordingly, the Court grants Fossil's motion as to this ground.

### c.   *"signaling new data for transfer" and "polling"*

Claims 1 and 12 of the '752 patent, claim 1 of the '794 patent, and claim 1 of the '847 patent each require the data capture device to "signal[]" data for transfer while the mobile device "listen[s]."  '752 patent at 11:60-12:13 (claim 1); *id.* at 13:65-14:16 (claim 12); '794 patent at 11:62-12:12 (claim 1); '847 patent at 12:32-51 (claim 1).  Similarly, claim 16 of the '794 Patent requires "polling the Bluetooth enabled data capture device using the software module on the Bluetooth enabled mobile device" while the data capture device "listens for the polling request sent from the Bluetooth enabled mobile device."  '794 Patent at 14:30-35 (claim 16).

1    The Court construed "polling" to mean "'checking status [of] on a predetermined basis'

2  where 'predetermined' refers to programming that sets the frequency of the status checks (e.g., at

3  set intervals, dynamic intervals, randomly, etc.)."  Dkt. No. 186 at 19-20.  For context, the Court's

4  previous discussion of "polling" in its claim construction order bears repeating:

> The parties agree on the basic idea of polling. Rather than having the
> data capture device send data immediately as it is received, the mobile
> device "periodically polls the digital data capture device 201 to
> determine the creation of a new file" for transfer. This confers
> technical benefits because it allows the data capture device to
> maintain low power except for brief intervals of communication
> initiated by the mobile device . . .

9  Dkt. No. 186 at 19-20 (internal citations omitted).

10    Fossil argues that the Fossil HR Hybrids do not perform "polling" or "signaling the new

11  data for transfer" while the mobile device listens as claimed by the asserted patents.  According to

12  Fossil, the Fossil Hybrid App instead pulls data from Fossil HR Hybrids upon user request.  To

13  support this, Fossil offers its expert Peter Rysavy's report.  Dkt. No. 265-15.  Rysavy testifies that

14  he has tested the Fossil Hybrid App and observed that the app "does not detect and receive

15  notifications" from the "Collider" – the tracker.  *Id.* ¶ 151.  Instead, "to obtain data, I had to

16  manually sync the Fossil Hybrid Smartwatches App and the Collider, or close and re-open the

17  Fossil Hybrid Smartwatches App to force a sync of the data."  *Id.*  Rysavy further opined that his

18  "testing indicates that the Collider does not use a 'push' operation.  Instead, the Fossil Hybrid

19  Smartwatches App 'pulls' data from the Collider."  *Id.* ¶ 152.  Fossil argues that Cellspin admits to

20  this functionality in its '794 Patent infringement contentions.  Dkt. No. 265-12 ('794 patent

21  infringement contentions) at 189.  The Court agrees.  In these contentions, Cellspin asserts that

22  "the Fossil Sports Smartwatch Wearable stores the new Fitness Data at least until the Bluetooth

23  enabled mobile device, via operation of the Fossil Mobile Application, sends a request to the

24  Fossil Sports Smartwatch Wearable for new data to be sent, or synced, from the Fossil Sports

25  Smartwatch Wearable to the Bluetooth enabled mobile device, including by operation of the Fossil

26  Mobile Application, over the established Bluetooth wireless connection between the devices."  *Id.*

27  Cellspin continues that "[s]uch request may be, for example, at a pre-set time, or upon manual

28  input to the Fossil Mobile Application, i.e., by pressing the "Sync Now" button[.]"  *Id.*  This

United States District Court
Northern District of California

1    evidence together indicates that the Fossil HR Hybrids do not "poll[]," "listen[]," or "pull[]" data

2    as required by the asserted patents.  In Cellspin's own words, a user uses the Fossil mobile app to

3    manually send a request to the Fossil Watch "for new data to be sent, or synced . . . over the

4    established Bluetooth wireless connection."  *Id.*

5          Cellspin responds with Vijh's testimony that the Fossil HR Hybrids meet the claimed

6    definition of "polling."  Dkt. No. 284 at 27.  Cellspin asserts that Vijh explains that polling "is

7    typically accomplished by reading the values of characteristics on the Fossil Devices at regular

8    time intervals or upon defined events."  *Id.* at 27 (citing Dkt. No. 265-6 (Vijh Expert Report) ¶

9    206).  However, Vijh's actual words are that polling "is typically accomplished by reading the

10   values of characteristics on the capture device at regular time intervals or upon set events such as

11   resumption of activity *or user request*."  Dkt. No. 265-6 (Vijh Expert Report) ¶ 206.  This

12   misstates the Court's construction that "polling" is the act of "checking the status on a

13   predetermined basis."  Under the Court's construction, "polling" does not occur, as Vijh opines,

14   upon "user request."  To the contrary, a user's act of requesting a signal on the capture device does

15   not meet the Court's construction of "polling."  Accordingly, Vijh's conclusion that the accused

16   Fossil HR Hybrids meet the "polling" limitation contradicts the language and reasoning behind a

17   court's claim construction order and thus cannot be used to create an issue of fact that precludes

18   summary judgment.  *See Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1332-34 (Fed. Cir. 2016)

19   (affirming summary judgment of non-infringement where the testimony of plaintiff's expert was

20   based on an incorrect understanding of the district court's claim construction.).

21         In addition to its improper interpretation of the Court's construction, Vijh's report cannot

22   raise a genuine dispute of fact because it cites to two documents with no explanation how they

23   indicate infringement.  Vijh claims that the first document "sets a

24   LAST_SYNC_UPDATE_INTERVAL [variable] on the mobile device to 60 seconds."  Dkt. No.

25   265-6 (Vijh Expert Report) ¶ 206 (citing Dkt. No. 286-38 at 2).  However, Vijh does not explain

26   how the variable indicates "polling."  During his deposition, Vijh was repeatedly asked if

27   "LAST_SYNC_UPDATE_INTERVAL" was a polling parameter, yet he could only explain that it

28   "relate[d] to polling."  Dkt. No. 265-10 (Vijh Depo. Tr.) at 115:12-14, 116:8-22.  In other words,

1    Vijh could not answer or explain how the document – evidence he based his own opinion on –

2    constituted evidence of "polling."  As Fossil's expert Rysavy explains,

3    LAST_SYNC_UPDATE_INTERVAL "is unrelated to polling."  Dkt. No. 292-1 (Rysavy Expert

4    Report) ¶ 201.  Rysavy testifies that the variable is "used to prevent multiple sync sessions

5    triggered by the user continuously (which may reduce battery of both the mobile device and

6    watch), so that if one sync session is completed and a user triggers another sync within 60

7    seconds, the app will not request data from the watch."  *Id.*  Cellspin's expert says nothing to

8    contradict this explanation.  As for the second document, Vijh's report states that it "describes a

9    function in the BleCommunicator class for 'onSyncDataRead.'"  Dkt. No. 265-6 (Vijh Expert

10   Report) ¶ 206 (citing Dkt. No. 286-39).  This document is insufficient evidence for the same

11   reasons as the first document:  neither Cellspin nor Vijh explain how the "BleCommunicator class

12   for 'onSyncDataRead'" indicates that the Fossil HR Hybrids perform "polling."

13           Drawing all reasonable inferences in Cellspin's favor, the Court concludes that Cellspin

14   has not raised a genuine issue of material fact that the Fossil HR Hybrid products meet the claimed

15   "polling" limitation.  The Court grants Fossil's motion as to this ground.

16                                    *        *        *

17           For the reasons above, Fossil's motion for summary judgment is granted.[45]

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   _____

27   [45] The Court does not reach Fossil's arguments regarding Cellspin's use of representative
     products, whether Fossil HR Hybrid data is "ma[de] available at the one or more web services,"
28   and whether Fossil HR Hybrids attach a "web address" to new data, because it concludes that
     other issues are dispositive of Fossil's summary judgment motion.

60

United States District Court
Northern District of California

1   //

2   **E.**   ***Cellspin Soft, Inc. v. Garmin International, Inc.*** **(17-5934)**

3      Cellspin asserts its three patents against more than 145 Garmin devices.  Cellspin and its

4   expert Rahul Vijh analyze three Garmin products (fēnix, Venu, and Edge 530) as representative of

5   all accused products.  Garmin moves for summary judgment of non-infringement.  Dkt. No. 199.[46]

6            *1.*   Asserted Claims

7                 *a.*   ʼ794 Patent

8                      i.   "providing a software module"[47]

9      A claim of direct infringement of a patent is only applicable to infringement that occurs

10  within the United States.  *NTP, Inc.*, 418 F.3d at 1313.  Thus, use of a method claim does not give

11  rise to infringement unless each step or stage of the claimed method is performed within the

12  United States.  *Id.* at 1318; *see also Ormco Corp.*, 609 F. Supp. 2d at 1067 ("The use of a process

13  only constitutes infringement of a patented claim if 'all steps or stages of the claimed process' are

14  performed in the United States." (quoting *NTP, Inc.*, 418 F.3d at 1318)).

15     Claims 1 and 16 of the ʼ794 patent both recite "providing a software module on the

16  Bluetooth enabled data capture device."  ʼ794 patent at 11:52-53; 14:17-18.  Garmin moves for

17  summary judgment on Cellspin's ʼ794 patent infringement claims on the ground that any

18  performance of "providing a software module" necessarily occurs outside the United States where

19  Garmin manufactures its products.

20     As it did above, *see supra* Section III.A.1.b., Cellspin argues that "providing" in this

21  context is a question for the jury.  Cellspin contends that "substantial evidence" supports Garmin's

22  performance of the claimed "providing" through its software "either (i) at the point of sale and

23  delivery to the customer, and/or (ii) by virtue of software updates to devices in the United States."

24  Dkt. No. 208 at 14.  This theory requires the interpretation that Garmin's *software* itself

25  "provid[es] a *software* module."  Not only is this interpretation counter-intuitive, but it contradicts

26

27            [46] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Garmin International, Inc.*, No. 4:17-CV-5934 (N.D. Cal.).

28            [47] This is the similar to the issue contested in *Fitbit.  See supra* Section III.A.1.b.

United States District Court
Northern District of California

1    Cellspin's infringement expert's own testimony that "it is obvious and necessarily true that the

2    Accused Instrumentalities are each provided with a software module *at the time* they are

3    manufactured and shipped to consumers by the Defendant."  Dkt. No. 199-8 (Vijh Expert Report)

4    ¶ 166 (emphasis supplied).  Cellspin does not dispute this.  *See* Dkt. No. 208-2 (Cellspin's

5    Responsive Separate Statement) at 5 (Issue 2, Fact 1).  Moreover, Cellspin baldly offers evidence

6    as allegedly supporting this theory (financial spreadsheets, its own infringement contentions, and

7    user manuals for the accused products), but Cellspin does nothing to rebut its own expert's

8    conclusion let alone explain how Garmin performs the recited "providing" at the point of sale or

9    through software updates.  Neither the plain language of the asserted claims nor Cellspin's

10   evidence support the theory that Garmin's software performs the step of "providing a software

11   module on the Bluetooth enabled data capture device."  Thus, Cellspin's theory does not provide a

12   basis upon which summary judgment should be denied.

13       In summary, elements of the '794 patent recite the manufacturing and shipment of software

14   to consumers.  Dkt. No. 199-8 (Vijh Expert Report) ¶ 166 ("[I]t is obvious and necessarily true

15   that the Accused Instrumentalities are each provided with a software module at the time they are

16   manufactured and shipped to consumers by the Defendant.").  It is undisputed that Garmin's

17   accused products are manufactured and assembled outside of the United States.  *See* Dkt. No. 208-

18   2 (Cellspin's Responsive Separate Statement) at 6 (Issue 2, Fact 3).  Thus, Garmin's performance

19   of functions claimed by the '794 patent occurs outside of the United States, and cannot give rise to

20   infringement.  *NTP, Inc.*, 418 F.3d at 1318.  The Court grants Garmin's motion as to this ground.

21                    *b.    '752 Patent*

22                    i.    "establishing a secure paired Bluetooth connection"

23       Next, Garmin argues that it cannot infringe the '752 patent because only its end users can

24   perform the claimed "establishing a secure paired Bluetooth connection" between "data capture

25   device" and "mobile device."  *See* '752 patent at 11:52-56 (claim 1); *id.* at 13:60-64 (claim 12).

26       Cellspin disputes this conclusion, contending that all steps of the '752 patent are "directly

27   performed by Garmin's software."  Dkt. No. 208 at 11.  Cellspin likens this situation to that in

28   *SiRF Tech. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1329-30 (Fed. Cir. 2010), in which it claims

United States District Court
Northern District of California

62

the Federal Circuit found direct infringement "even though certain steps were carried out only after a user action[] because its software actually performed or dictated the performance of all steps." Dkt. No. 208 at 11.  In other words, even if certain method steps necessarily require user input, a single entity directly infringes if its software necessarily carried out performance of the certain method steps.  However, *SiRF* does not stand for the proposition.  In *SiRF*, the defendant designed and manufactured a chip incorporated in the end user's device that performed all the claimed method steps.  *Id.* at 1330-31.  The Federal Circuit held that "[t]his is not a situation where a method claim specifies performance of a step by a third party, or in which a third party actually performs some of the designated steps, and thus control or direction of the performance of that step by the accused infringer is required.  Rather, the method claims at issue here are drawn to actions which can be performed and are performed by a single party." *Id.* at 1329.  The Federal Circuit concluded that the *SiRF* defendant directly infringed because the method claims "do not require that any of the steps be performed here by the customers or the end users, and the disputed steps are not in fact performed by third parties[.]" *Id.*  By contrast, the claims asserted here require the "establishing" of a "paired Bluetooth connection" – a step Cellspin does not dispute is performed by Garmin's end users.  *See* Dkt. No. 216 (Mot. Hr'g Tr.) at 39:17-40:1 ("[Y]es, there is a user input.  There is some user action required.").

Accordingly, the Court rejects Cellspin's theory that Garmin's software perform the claimed "establishing a secure paired Bluetooth connection."

### c.   Internal Testing Theory[48]

Garmin moves for summary judgment on Cellspin's infringement theory that Garmin infringes the asserted '752 and '794 method patents through "extensively test[ing]" its own products.  Dkt. No. 208 at 13.  In support, Cellspin cites to a paragraph from its expert report stating that "[a]dditional materials support the conclusion that Defendant instructs and encourages users to perform the acts which, in my opinion, constitute infringement."  Dkt. No. 199-8 (Vijh Expert Report) ¶ 228.  In that paragraph, Vijh lists off a string cite of evidence without explanation

---

[48] This is the same issue contested in *Fitbit, see supra* Section III.A.1.d, *Nike, see supra* Section III.B.3, and *Fossil, see supra* Section III.D.1.b.i.

1   how they support the conclusion and opines that "it is evident from the materials I have reviewed

2   that the Defendant itself makes and uses the inventions, including as part of its test protocols." *Id.*

3   Again, this is insufficient to overcome a motion for summary judgment. *See Dynacore Holdings*,

4   363 F.3d at 1278 ("It is well settled that an expert's unsupported conclusion on the ultimate issue

5   of infringement is insufficient to raise a genuine issue of material fact[.]"). As in the other related

6   cases, Cellspin follows its expert opinion with an evidentiary string cite without any explanation

7   how the documents raise a genuine dispute of material fact that the recited claims are performed,

8   much less in the order required by the Court's construction. *See E-Pass*, 473 F.3d at 1222

9   (affirming summary judgment of non-infringement where patentee lacked proof that all claimed

10  method steps were performed in order).

11         Accordingly, Garmin's motion is granted as to this theory.

12              d.      Direction and Control Theory[49]

13         Garmin also moves for summary judgment of non-infringement against Cellspin's theory

14  that Garmin directs or controls its end users to perform claimed steps of the method patents.

15         "[A]n entity [is] responsible for others' performance of method steps in two sets of

16  circumstances:  (1) where that entity directs or controls others' performance, and (2) where the

17  actors form a joint enterprise." *Akamai*, 797 F.3d at 1022.  Under the "directs or controls" theory,

18  "liability . . . can also be found when an alleged infringer conditions participation in an activity or

19  receipt of a benefit upon performance of a step or steps of a patented method and establishes the

20  manner or timing of that performance." *Id.* at 1023.

21         Garmin contends that it cannot be held liable for direct infringement because it does not

22  condition participation in an activity or receipt of a benefit upon performance of a claimed method

23  step.  This is because, Garmin argues, it does not require its customers to use Bluetooth to pair the

24  accused devices and Garmin Connect Mobile, the accused mobile application.  *See* Dkt. No. 208-2

25  (Cellspin's Responsive Statement of Facts) at 2 (Issue 1, Fact 4).  Garmin references a support

26  document posted on Garmin's website, Dkt. No. 199-17 at 1, and user manuals for each of the

27  _____

28         [49] This is the same issue contested in *Fitbit, see supra* Section III.A.2.b, *Nike, see supra*
     Section III.B.5.a, and *Fossil, see supra* Section III.D.1.b.iv.

United States District Court
Northern District of California

three allegedly representative products, Dkt. Nos. 199-18 (fēnix 6) at 27, 199-19 (Venu) at 38, 199-20 (Edge 530) at 44, each instructing users on the ways to send new data from the Garmin products to the Garmin website.  Cellspin responds that several benefits conditioned on Bluetooth pairing are the safety and tracking features known as "LiveTrack and/or GroupTrack," Dkt. No. 208-2 (Cellspin's Responsive Statement of Facts) at 2 (Issue 1, Fact 4) ("Garmin requires Bluetooth pairing, including for LiveTrack and/or GroupTrack.").  The fēnix 6 user manual defines LiveTrack as the ability to "[a]llow friends and family to follow your races and training activities in real time" and GroupTrack as the ability to "keep track of your connections using LiveTrack directly on screen and in real time."  Dkt. No. 199-19 at 28.  The manual further states that "[t]o use these features, your device *must be connected* to the Garmin Connect app using Bluetooth technology."[50]  *Id.* (emphasis supplied).  This appears to constitute circumstances where Garmin "directs or controls" its end users' performance because Garmin (1) conditions benefits – use of GroupTrack and LiveTrack – upon the performance of a claimed method step – Bluetooth pairing and (2) "establishes the manner or timing of that performance" where, upon performance of the "establishing a paired Bluetooth connection" step, Garmin's customers can use the Connected Features.

Viewing the record evidence in the light most favorable to Cellspin, the Court concludes that reasonable jurors could conclude that Garmin "conditions" its customers' use of the Connected Features on its customers' performance of the "establishing a paired Bluetooth connection" step.  Accordingly, Garmin's motion is denied as to this theory.

//

//

//

//

---

[50] A review of the fēnix 6 user manual reveals a list of "Connected Features" that include both the LiveTrack and GroupTrack features, as well as "Connect IQ," "Find my phone," and "Find my device" features.  Dkt. No. 199-19 at 23.  The manual states that the features "are available for your fēnix device when you connect the device to a compatible smartphone using Bluetooth technology and install the Garmin Connect app on the connected smartphone."  *Id.*

1    //

2                    e.      _Assembly Theory[51]_

3          Cellspin contends that "an assembly of the Accused Instrumentalities directly infringes the

4    Asserted System Claims of the '847 Patent."  Dkt. No. 208 at 13.  For support, Cellspin offers 24

5    paragraphs of its expert report, none of which mention this theory.  _Id._ (citing Dkt. No. 199-8

6    (Vijh Expert Report) ¶¶ 85-108).  This evidence is provided with no explanation how any element

7    of the asserted claims is met, only the conclusory statement that the report cites to "Garmin Source

8    Code, Garmin technical documents, Garmin witness testimony, and testing/observation of the

9    Accused Instrumentalities" and, on that basis, concludes that "each element of the Asserted

10   Claims of the '847 Patent are met by the Accused Instrumentalities."  _Id._  Cellspin's efforts are

11   insufficient to overcome a motion for summary judgment.  _See Dynacore Holdings_, 363 F.3d at

12   1278 ("It is well settled that an expert's unsupported conclusion on the ultimate issue of

13   infringement is insufficient to raise a genuine issue of material fact[.]").

14          Accordingly, Garmin's motion is granted as to this theory.

15                    f.      _Inducement Theory[52]_

16          Garmin moves for summary judgment of non-infringement under Cellspin's theories that

17   Garmin (1) induces its customers to perform all steps of the claimed method '794 and '752 patents

18   when they assemble and use the infringing system as instructed by Garmin; and (2) induces its

19   customers to put into use the entire system claimed by the '847 patent.  Dkt. No. 199 at 14-15.

20   Garmin argues that it does not induce its customers because neither mobile phone applications nor

21   mobile phones are required to use Garmin's devices.  _Id._

22          Cellspin has not raised a genuine dispute of material fact that Garmin's customer users

23   directly infringe any of the asserted patents.  First, Cellspin has not raised a genuine dispute of

24   material fact that assembly of any kind directly infringes the '847 patent's claims.  _See supra_

25   Section III.E.1.c.i.  Second, Cellspin has not raised a genuine dispute of material fact that use of

26

27          [51] This is the same issue contested in _Nike_, _see supra_ Section III.B.4, and _Fossil_, _see supra_
     Section III.D.1.b.iv.

28          [52] This is the same issue contested in _Fossil._  _See supra_ Section III.D.1.b.ii.

                                                    66

United States District Court
Northern District of California

the accused Garmin products performs the "providing a software module on the Bluetooth enabled data capture device" recited by claims 1 and 16 of the '794 patent. *See supra* Section III.E.1.a. Finally, Cellspin has not raised a genuine dispute of material fact that use of the accused Garmin products performs the "detect[ion]" or "determin[ation]" of "new data for transfer" or the "attaching" or "applying" "user identifier" to "new data" required by the '794 and '752 patents. The Court has detailed in Sections III.E.1.d and III.E.1.f the extent of the proffered made and the reasons for its inadequacy. The analysis here is identical and dispositive.

Therefore, because Cellspin cannot show direct infringement of the asserted patents, Cellspin cannot prove inducement of infringement. *See Limelight Networks, Inc.*, 572 U.S. at 921 ("Liability for inducement must be predicated on direct infringement."); *Joy Techs.*, 6 F.3d at 774 ("Liability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement.").

Accordingly, Garmin's motion is granted as to this ground.

2.    *"detect" and "determine[e]" "new data"*

The '752 and '794 patents require a Bluetooth enabled capture device to "detect" and "determin[e]" "new data for transfer." '794 patent at 11:65-67 (claim 1); *id.* at 14:36-38 (claim 16); '752 patent at 11:60-62 (claim 1); *id.* at 13:65-67 (claim 12). Garmin argues that its accused watches only "push" data at time intervals from device to phone and Cellspin thus cannot raise a genuine dispute of material fact that Garmin's watches perform the claimed "detect" and "determin[e]" functions. Dkt. No. 199 at 16.

Cellspin replies that "Mr. Vijh has explained, with evidentiary support, how the Accused Instrumentalities do, in fact, literally and directly meet these limitations." Dkt. No. 208 at 19. Cellspin cites to 22 paragraphs of Vijh's expert report with the parenthetical that the report cites "Garmin Source Code." *Id.* (citing Dkt. No. 199-8 (Vijh Expert Report) ¶¶ 114-21, 145-50, 171-74, 202-05). However, those paragraphs only offer the conclusory assertion that the accused Garmin devices "detect" or "determin[e]" "new data." By way of example, paragraph 115 concerning the "detecting and signaling the new data for transfer" limitation states that "[t]he

1  Accused Mobile Applications, when running on a mobile device, use mechanisms coded in its

2  source code to detect and receive the Event Notification over the paired connection." *Id.* ¶ 115.

3  That paragraph cites source code stating that it "includes a function on the data capture device for

4  subscribing to notifications of real-time updates to data such as heart rate and accelerometer values

5  and the sending of real-time data to a subscriber." Dkt. No. 199-8 (Vijh Expert Report) ¶ 115

6  (citing Dkt. No. 209-19). Left unexplained is how the function shows that the Garmin devices

7  perform the claimed "detect" function. Aside from Vijh's conclusory opinion, Cellspin offers 8

8  pages of infringement charts with no explanation for what they show and Vijh's deposition

9  testimony that likewise does not indicate infringement. Cellspin cannot meet its burden at

10  summary judgment. *See Ferring B.V.*, 437 F.3d at 1193 ("Conclusory allegations and attorney

11  arguments are insufficient to overcome a motion for summary judgment." (citation omitted)).

12        Accordingly, the Court grants Garmin's motion as to this ground.

13              3.    '752 Patent

14                  a.    <u>Temporal Order</u>[53]

15        The Court construed the terms of the asserted '752 and '794 method patents so that the

16  recited elements must be performed in the order they appear in the claims. Dkt. No. 155 at 9-10.

17  Thus, to prove infringement Cellspin must show that each step of the asserted method claims was

18  performed in required order. *See E-Pass*, 473 F.3d at 1222 (affirming summary judgment of non-

19  infringement where patentee lacked proof that claimed method steps were performed in order).

20  Garmin moves for summary judgment on the ground that there is no genuine dispute of material

21  fact that its accused products perform the claim elements in the required order.

22        Cellspin responds that "[a]s summarized by Mr. Vijh, for a given bit of data, the

23  progression and order of steps in the Accused Devices precisely meets the Asserted Claims." Dkt.

24  No. 208 at 12 (citing Dkt. No. 199-8 (Vijh Expert Report) ¶ 134). The cited paragraph from

25  Vijh's expert report contains a series of conclusions that the accused devices perform each claimed

26  function in the required order. However, the assertions do not explain how or why certain

27

28               [53] This is the same issue contested in *Fitbit*. *See supra* Section I.A.1.a.

*United States District Court*
*Northern District of California*

functions are performed before or after others.  For example, the Court's construction requires that the claimed "event notifications" are enabled after "acquiring new data in the Bluetooth enabled data capture device" and before "determining existence of the new data for transfer."  On this topic, Vijh's Report states "the event notifications are enabled only after the message is received from the mobile devices on which the Accused Mobile Applications are installed requesting enablement."  Dkt. No. 199-8 (Vijh Expert Report) ¶ 134 (citing *id.* ¶ 118).  The report does not indicate why event notifications are enabled after the message is received requesting enablement.  The only evidence offered is Garmin source code that Vijh states contains "a function on the data capture device for allowing subscriptions to notifications of real-time updates to data such as heart rate and accelerometer values and the sending of real-time data to a subscriber."  *Id.*  Even crediting Vijh's description, it does not explain or otherwise indicate the performance of the event notifications in the requisite order.

Accordingly, the Court grants Garmin's motion as to this ground.

### b.    *"attaching" "user identifier" to "new data"*[54]

The claims of the '752 and '794 patents require "attaching" or "applying" a "user identifier" to "new data."  '794 patent at 12:20-24 (claim 1); *id.* at 14:46-50 (claim 16); '752 patent at 12:17-37 (claim 1); *id.* at 14:26-32 (claim 12).  Garmin moves for summary judgment on the '752 and '794 method patent claims on the ground that Cellspin cannot raise a genuine issue of material fact that Garmin's accused watches perform the recited "attach[ment]" of a "user identifier" to "new data."  Dkt. No. 199 at 23-24.

Cellspin responds by offering the theory that "attach[ment]" takes place through "the use of OAuth tokens."  Dkt. No. 208 at 23.  As in other cases, *see supra* Sections III.A.3, III.B.2.a, and III.D.2.b, Cellspin did not identify this theory in its infringement contentions, which state only that the claimed "user identifier" could be a "username or email address, or information based off of a user or the user's associated wearable device."  Dkt. No. 199-12 at 41.  "[A] party may not use an expert report to introduce new infringement theories, new infringing instrumentalities, new

---

[54] This is the same issue contested in *Fitbit*, *see supra* Section III.A.3, *Nike*, *see supra* Section III.B.2.a, and *Fossil*, *see supra* Section III.D.2.b.

United States District Court
Northern District of California

1    invalidity theories, or new prior art references not disclosed in the parties' infringement

2    contentions or invalidity contentions." *Finjan, Inc.*, 2021 WL 1253651, at *2 (quoting *Looksmart*

3    *Group, Inc. v. Microsoft Corp.*, 386 F. Supp. 3d 1222, 1227 (N.D. Cal. 2019).

4        Because Cellspin did not disclose the "OAuth" theory in its contentions, the theory is

5    barred from trial.  Cellspin does not raise a genuine material dispute that Garmin's accused

6    products "attach" a "user identifier" to "new data."  The Court grants Garmin's motion for

7    summary judgment on this ground.

8                    *4.    '847 Patent*

9                    *a.    "first processor"*[55]

10       The asserted claims of the '847 system patent recite "a first processor" "configured to": (1)

11   "acquire new-data," (2) "store the acquired new-data," and (3) "send an event notification."  '847

12   patent at 12:27-41.  Garmin moves for summary judgment on the ground that Cellspin cannot

13   demonstrate how the accused Garmin Watches contain a "first processor" as claimed by the '847

14   patent.

15       While Cellspin offers Vijh's deposition testimony to support this "reliance," Vijh does not

16   identify a claimed "first processor" in his testimony.  Cellspin asserts that Vijh relied "on standard

17   computer system architecture and the exemplary "Maxim MAX32630" with an "ARM Cortex M4

18   Core Processor" to identify the claimed "first processor."  Dkt. No. 204 at 20.  However, Vijh's

19   report never mentions either basis for any of his opinions.  At best, Vijh testifies that the accused

20   Garmin fēnix 6 contains both an "Maxim ARM MCU" and a "Nordic Wi-Fi/BT SOC" responsible

21   for processing data.  Dkt. No. 199-15 (Vijh Depo. Tr.) at 38:2-15.  The other Vijh testimony that

22   Cellspin offers states that "even if there are two processors, it doesn't mean that there are two parts

23   completely – two completely different disjointed processors.  If you have two processors, they

24   work in tandem with each other such that there is only one processor."  *Id.* at 64:4-9.  Again, this

25   does not identify a processor in the accused products.  Vijh's testimony continues that "[i]t is not

26   important for this report to distinguish between different processors or whether one device has two

27   ───────────────────

28       [55] This is the same issue contested in *Fitbit*, *see supra* Section III.A.5.a, and *Nike*, *see*
     *supra* Section III.B.2.b.i.

1    processors or one processor.  It is only important that each device has a processor."  *Id.* at 64:12-

2    16.  The Court disagrees.  Infringement of the '847 patent requires the identification of a "first

3    processor" performing the recited functions.

4         Cellspin argues that "Mr. Vijh has explained how the infringing first processor does indeed

5    meet the claim limitations."  Dkt. No. 208 at 24.  Yet instead of explaining how the source code or

6    accused Garmin watch meets the claimed limitations, Vijh's report offers only conclusory

7    opinions that because the accused Garmin watch performs certain functions (*e.g.*, storing the

8    acquired new data), a single "first processor" operating the watch necessarily performs them.  *See*

9    Dkt. No. 199-8 (Vijh Expert Report) ¶ 92 ("By reviewing the materials available to me, including

10   the Defendant's source code, it is apparent that the Accused Instrumentalities call for at least one

11   of the hardware sensors to capture data, from which new data is acquired.  For example,

12   GARMIN_SOURCE_000207-000209 relate to the capture and acquisition of heart rate data from

13   a paired tracker (or data capture sensor).").  Even assuming that the offered source code did "relate

14   to the capture and acquisition of heart rate data," Vijh does not adequately explain how that

15   implies that a "first processor" performs the recited functions.

16        None of the evidence Cellspin offers creates a triable dispute of material fact that a "first

17   processor" performs the recited functions required by the asserted patents.  Accordingly, Garmin's

18   motion is granted as to this ground.

19                    b.    *"second processor"*[56]

20        Claim 1 of the '847 patent requires a "second processor" located in the Bluetooth enabled

21   cellular phone that:  (1) detects and receives the new data, (2) listens for the event notification, (3)

22   receives the event notification and the new data, (4) stores the new data, and (5) uses HTTP to

23   transfer the new data from the Bluetooth enabled cellular phone to a website.  *See* '847 patent at

24   12:45-67.  Garmin moves for summary judgment on the ground that Cellspin has failed to identify

25   a single "second processor" in a Bluetooth enabled cellular phone performing the functions

26   claimed by the '847 patent.

27   _____

28   [56] Cellspin's arguments here are identical to those made in *Nike* down to its use of the very
     same documents from *Garmin* (impermissible in *Nike*).  *See supra* Section III.B.2.b.ii.

1       Cellspin argues that the source code of the accused Garmin mobile application raises a

2   genuine dispute of material fact that an operating mobile device contains a "second processor"

3   performing the functions claimed in the '847 patent.  Dkt. No. 208 at 24-25.  Cellspin contends

4   this is because the "accused mobile applications include executable code which, when executed,

5   results in the control of a processor to perform the recited functions." *Id.* at 25.  Cellspin offers

6   Vijh's testimony that the Garmin mobile app source code "necessarily controls the processor on

7   which it is installed in order to execute." *Id.* (citing Dkt. No. 199-8 (Vijh Expert Report) ¶ 95).

8   Cellspin continues that "Mr. Vijh has explained, including with citations to Garmin's source code,

9   how the code is executed by the processor to perform the recited functions." *Id.*  This conclusory

10   expert opinion, offered with lengthy string cites and no explanation, is insufficient because it does

11   not explain how the Garmin mobile application source code (let alone a processor operating the

12   mobile device) performs the recited functions.  Cellspin cannot simply cite to swaths of documents

13   without explanation in expectation that the Court will analyze it to determine a triable issue of

14   material fact. *See Biotec Biologische Naturverpackungen GmbH & Co. KG*, 249 F.3d at 1353 ("It

15   is not the trial judge's burden to search through lengthy technologic documents for possible

16   evidence."); *see also Keenan*, 91 F.3d at 1279 (district court is not obligated "to scour the record

17   in search of a genuine issue of triable fact").

18       Further, Cellspin contends that "Mr. Vijh has testified that iPhone devices contain a single

19   processor in the form of an Apple APL1W01 A14 Bionic System on Chip."  Dkt. No. 208 at 25.

20   Cellspin offers two documents for support, Dkt. Nos. 199-15, 208-15, but neither indicates that the

21   operating device contains a single processor performing the recited functions.

22       The Court concludes that Cellspin does not meet its evidentiary burden to show that there

23   is a triable dispute of material fact that a "second processor" performs the recited functions of the

24   asserted patents.  Garmin's motion is granted as to this ground.

25                             \*       \*       \*

26       For the reasons above, Garmin's motion for summary judgment is granted.[57]

27   _____

28       [57] The Court does not reach Garmin's arguments regarding Cellspin's use of representative

United States District Court
Northern District of California

**F.**   *Cellspin Soft, Inc. v. Nikon Americas, Inc.* **(17-5936)**

Cellspin asserts its patents against 28 Nikon digital single-lens reflex (known as "DSLR") cameras, mirrorless cameras, and compact cameras.  For purposes of infringement analysis, the parties stipulate that the Nikon D3500 DSLR is representative of the accused DSLRs and mirrorless cameras, and the Nikon Coolpix B600 is representative of the accused compact cameras.  Nikon moves for summary judgment of non-infringement.  Dkt. No. 191.[58]

*1.    Nikon's Two-Connection Process*

Nikon seeks summary judgment of non-infringement on the ground that its devices operate through a two-connection Bluetooth process, not a single-connection process claimed by the asserted patents.

Claim 1 of the '794 patent requires the data capture device and the mobile device to "establish[] a paired connection" over Bluetooth.  '794 patent at 11:56-58.  After acquiring new data, the data capture device will "send[] a data signal [] corresponding to existence of new data [] over *the* established paired Bluetooth connection," and then "transfer[] the new data [] over the paired Bluetooth connection."  *Id.* at 12:1-12; *see id.* at 14:21-43 (claim 16 of the '794 patent similarly requires "establishing a paired connection" between the devices, followed by communicating the availability of new data for transfer – *i.e.*, "polling" and sending "polling request" over "the established paired Bluetooth connection" in order to "determin[e] the existence of new data for transfer," and then "transferring the new data [] over the paired Bluetooth connection").  The '752 and '847 patents also require "establishing a secure paired Bluetooth connection" and each subsequent reference to the Bluetooth connection is prefaced with "the established."  *See* '752 patent at 11:52-56; '847 patent at 12:17-25.

The term "paired connection" or some variant appears throughout the asserted patent claims.  Because the asserted claims introduce the recited "connection" using the indefinite article

---

products or "new data" sent to Garmin's web servers because other issues are dispositive of Garmin's summary judgment motion.

[58] Each docket citation in this section corresponds to *Cellspin Soft, Inc. v. Nikon Americas, Inc.*, No. 4:17-CV-5936 (N.D. Cal.).

"a" and then subsequently refer to that same connection with the definite article "the," it is clear that the "connection" is the same connection throughout the claim. *See Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-cv-05194-LHK, 2019 WL 4645338, at *47 (N.D. Cal. Sept 24, 2019) ("The Court has consistently recognized that 'the Federal Circuit has held that claim terms '[b]ased on [an] antecedent basis relationship . . . carry the same meaning throughout the claims." (citation omitted)); *see also X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1034 (N.D. Cal. 2020) ("The Federal Circuit has held that, generally, a "single claim term should be construed consistently with its appearance in other places in the same claim or in the other claims of the same patent." (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001))). "[W]here, as here, a claim term first appears with the indefinite article 'a' and later appears with a definite article, such as 'the,' the Federal Circuit has found that the terms share an 'antecedent basis' relationship and apply an 'initial assumption' that the latter occurrence carries the same meaning as the former." *Id.* (quotation omitted).

At claim construction, the parties briefed the term "new data is data acquired after the paired connection is established" in the asserted claims. Dkt. No. 151 at 14-15. The Court noted that during the prosecution of the '794 patent, Cellspin argued that, opposed to "the conventional approach of disconnecting the paired connection after data transfer to save power," the '794 patent "'took the opposing view,' which is to . . . maintain the [Bluetooth] paired connection on a continuous basis for the application' and 'not to disconnect the [Bluetooth] paired connection after the transfer of data.'" The Court found this to be a "clear and unambiguous disclaimer of paired connections that are not maintained on a continuous basis." Thus, the Court construed "after the paired connection is established" as "after the paired connection is established and *maintained on a continuous basis*." *Id.* at 14-15 (emphasis supplied).

Nikon seeks summary judgment of non-infringement on the grounds that its devices operate through a two-connection process – one connection over a ███████████████ ████████████████████████████████████████, and another connection over a ███████████████████████████████. This process, Nikon asserts, "fundamentally differs" from the recited claims because they require "data signal" / "event

74

1  notification" / "polling request" for communicating the "existence of new data," and the transfer

2  of new data over a single paired Bluetooth connection.  Dkt. No. 190-2 at 1.

3      For support, Nikon offers testimony that when its accused product transfers images

4  through the SnapBridge mobile app, it uses two separate and distinct connections through the two

5  different Bluetooth radios.  First, the camera establishes an █████████████████ with the

6  mobile device to █████████████████████████████.  Then, once the

7  camera has new data for transfer, it sends a ████████████████████ to the

8  mobile device.  *See* Dkt. No. 190-4 (Haas Expert Report) ¶ 99.

9      Once the mobile device receives this information, it proceeds to disconnect the █████

10  ████████ and █████████████████████████████████

11  █████.  According to Nikon, this two-connection process differs from the single-connection

12  process claimed by the asserted claims, which require "data signal" / "event notification" /

13  "polling request" to communicate the "existence of new data," and data transfer over a single

14  paired Bluetooth connection.  Nikon offers the supporting testimony of Cellspin's validity expert,

15  Dr. Michael Foley, who testified that BTC and BLE are distinct connections that differ in the

16  amount of energy they consume and how they discover and connect devices.  Dkt. No. 191-9

17  (Foley Depo. Tr.) at 132:25-149:19; *id.* at 140:22-141:1 ("Q. But then if I had a device that is only

18  Bluetooth Classic, it wouldn't be able to communicate with a device that's only Bluetooth Low

19  Energy; is that a correct understanding? A. That's correct."); *id.* at 141:6-10 ("Q. And does that

20  work the other way around, meaning if I had a device that is only BLE compatible and it wouldn't

21  be able to communicate with the device that's only Bluetooth Classic compatible? A. That, that's

22  correct.").  As Nikon explains, its devices use a two-connection process because █████████

23  ███████████████████████████████████████████████████

24  ████████████████████████████████████████

25  █████████████████████████.  *See* Dkt. No. 190-2 at 13-14.

26      Cellspin does not contest that Nikon's accused products operate through ████████████

27  ███████████████████████████████████████.  Instead, Cellspin

28

75

offers an infringement theory[59] that the BLE and BC are not different connections but rather a single infringing connection with two different radio technologies.  According to Cellspin, this is because the Nikon camera and mobile device "pair" during the initial setup and subsequent data transfers count as the same "paired" Bluetooth connection *because the user is not required to repeat the pairing procedure*.

Cellspin claims this is supported by a Nikon user manual stating that the only way for a user to disconnect a paired connection is to either disable Bluetooth or manually unpair the device. Dkt. No. 204-4.  It also offers its expert's opinion that both Bluetooth connection methods have and use "cryptographic link keys" to establish a paired Bluetooth connection.  Dkt. No. 204 at 10-11 (citing Dkt. No. 190-7 (Vijh Expert Report) ¶ 88).  Said differently, Vijh opines that two devices maintain a single Bluetooth paired connection on a continuous basis because they exchange the same set of link keys.  This is merely a broad conclusory statement "without any analysis to support it."  *See Traxcell*, 15 F.4th at 1130.  Further, Cellspin's efforts fail because it never addresses the element of the Court's construction requiring a connection "maintained on a *continuous basis*."  Dkt. No. 151 at 13 (emphasis supplied).

In summary, Cellspin does not rebut evidence indicating that Nikon's accused cameras' two-connection operation.  Its alternative infringement theory – measuring the connection by how many times it is paired (and not by whether it connects or disconnects) – is unsupported and, ultimately, not the focus of the asserted patents, which require the same "established connection" throughout and maintained on a "continuous basis."  Accordingly, the evidence does not indicate a material dispute of fact that Nikon's accused products meet the required elements of the asserted patents.  Nikon's motion is granted as to this ground.

---

[59] The parties dispute whether this is a new theory not disclosed in Cellspin's infringement contentions.  *See* Dkt. No. 190-2 at 15.  The Court finds that it need not resolve this issue because other issues are dispositive in granting summary judgment for Nikon.

United States District Court
Northern District of California

United States District Court
Northern District of California

2.      '794 Patent

a.      Performance Outside the United States[60]

The asserted claims require "providing a software module on the Bluetooth enabled data capture device." '794 patent at 11:52-53 (claim 1); id. at 14:17-18 (claim 16).  As Vijh's expert report explains, "the Accused Instrumentalities are each provided with a software module at the time they are manufactured and shipped to consumers by [Nikon]."[61]  Dkt. No. 190-7 (Vijh Report) ¶¶ 166, 197.  Thus, there cannot be infringement where Nikon's accused cameras are manufactured outside the United States,[62] a fact that Cellspin does not dispute.  Rather than claim that the accused products are manufactured in the United States, Cellspin offers a theory that Nikon "provides" the software module on the data capture device in the United States either:  (i) at the point of sale and delivery to the consumer, and/or (ii) by virtue of software updates to devices in the United States.  Dkt. No. 204 at 14.  This theory would imply that Nikon's own software provides the software on the Bluetooth enabled data capture device.  This is not what the plain language of the '794 patent states, and at any rate, the theory is contradicted by the testimony of Cellspin's own expert.  Thus, Cellspin fails to create a genuine issue of material fact.

b.      "[receiving/making available] at the one or more web services, the new data"

The asserted claims of the '794 patent require the elements "[receiving/making] the new data [available]" "at one or more web services."  '794 patent at 12:34-38 (claim 1); id. at 14:60-64 (claim 16).  Nikon seeks summary judgment on this infringement allegation on the grounds that

---

[60] This is similar to the issues analyzed in Fitbit, see supra Section III.A.1.b, and Garmin, see supra Section III.E.1.a.i.

[61] Cellspin tries to modify Vijh's statement, claiming that he "opined that the software modules of the Accused Devices are comprised of code existing at the time of manufacture and shipment to consumers."  However, this does not overcome Vijh's clear testimony that the claim element "providing a software module" is satisfied when products are manufactured.  See Dkt. No. 190-7 (Vijh Report) ¶ 166.

[62] Nikon offers its expert's testimony that Nikon's accused cameras are developed in Japan and manufactured in China and Thailand.  See Dkt. No. 190-4 (Haas Expert Report) ¶ 64 ("I have been further informed that third party Nikon Corporation, which is located in Japan, is responsible for the technical development of the accused Nikon products, and that the accused Nikon products are in turn manufactured in various locations in Asia."); see also Dkt. No. 190-6 (translated Nikon Manufacturing Plan "indicating that the representative Nikon Coolpix B600 and D3500 DSLR cameras are manufactured in China and Thailand, respectively").

77

these steps are performed outside the United States.  In support, Nikon points to the Terms of Use set out on its Nikon Image Space website.  The Terms of Use state that all image data is stored on servers located in Japan, not the United States:

> 1 Use of the NIKON IMAGE SPACE requires that the customer agree to:
>
>> a. all of these Terms of Use
>>
>> b. Customers who for any reason find themselves unable to agree to the Terms of Use shall be prohibited from using NIKON IMAGE SPACE. NIKON IMAGE SPACE is operated in Japan by Nikon, a Japanese company, and when using this service customers store and process image data on servers located in Japan. Customers should note that locations of the servers on which other data are stored or processed varies by membership type as shown below.
>>
>>> i. Japan: in the case of Members who are not "Nikon product owners plan" Members, or
>>>
>>> ii. Japan: the United Kingdom, the Republic of Ireland, or the United States of America in the case of Members who are "Nikon product owners plan" Members.

Dkt. No. 191-13 at 2.  Cellspin responds that the provision's reference to "other data . . . stored or processed" in "the United Kingdom, the Republic of Ireland, or the United States of America" in Section 1.a.ii "undercuts Nikon's position."  Dkt. No. 204 at 15.  Not so.  The reference to "other data" stored in locations like Ireland, the United Kingdom, and the United States – which Cellspin admits is its "only evidence of where data is stored," Dkt. No. 229 (Mot. Hr'g Tr.) at 30:1-4 – does not raise a genuine dispute of material fact.  As Nikon points, the terms clearly state: "NIKON IMAGE SPACE is operated in Japan by Nikon, a Japanese company, and when using this service customers store and process image data on servers located in Japan."  Dkt. No. 191-13 at 2.  Thus, Nikon has presented unrebutted evidence that its web servers are located in Japan, meaning it cannot infringe claims 1 and 16 of the '794 patent.

<center>*     *     *</center>

Accordingly, the Court grants Nikon's motion as to this ground.

3.      '752 Patent

a.      "establish[] a secured paired Bluetooth connection"

Both asserted independent claims of the '752 patent require "establishing a secured paired Bluetooth connection between" the data capture device and the mobile phone. *See*, *e.g.*, '752 patent at 11:52-56 (claim 1); *id.* at 13:60-64 (claim 12).

Nikon moves for summary judgment of non-infringement because its products "establish an ████████████████ before communicating the existence of new data for transfer to the mobile device." Dkt. No. 190-2 at 20. In support, Nikon offers an internal communication protocol specification document indicating that its products operate at a ████████████ ████████████████████████ Dkt. No. 190-6 at 132. Thus, Nikon contends, its products do not perform the required "establishing a secure paired Bluetooth connection." Dkt. No. 190-2 at 21.

Cellspin does not directly address Nikon's argument, instead stating that "both [BLE and BC] modes pertain to the same Bluetooth paired connection, as according to the asserted claims, established between two Bluetooth devices and characterized by the same link keys." Dkt. No. 204 at 15. Cellspin cites Vijh's report, claiming that "Mr. Vijh has established, with a full complement of supporting evidence, that these claim limitations are met in the Accused Instrumentalities." *Id.* at 16 (citing Dkt. No. 190-7 (Vijh Report) ¶¶ 88, 111, 112, 114). Upon review, Vijh only speculates that the accused objects establish a "secured connection" because a BLE connection "typically use cryptographic link keys." Dkt. No. 190-7 (Vijh Expert Report) ¶ 111. This opinion rests on the faulty presumption that a device established a "secured paired Bluetooth connection" because its Bluetooth connection modes "typically use cryptographic link keys." That is not sufficient evidence from which a reasonable fact-finder could find infringement. *See also Dynacore Holdings*, 363 F.3d at 1277-78 ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device"). Aside from Vijh's conclusory opinion, what remains is Cellspin's string cite to technical

79

source code without any explanation for how the accused devices establish a "secured" Bluetooth connection.

Accordingly, Nikon's motion is granted as to this ground.

### 4.    '847 Patent

#### a.    *"cryptographically authenticate"*[63]

The asserted claims of the '847 patent require a data capture device "to cryptographically authenticate identity of the Bluetooth enabled cellular phone" when the two devices establish "the paired Bluetooth wireless connection." '847 patent at 12:17-25.  The Court construed "cryptographically authenticate" to mean "verified as legitimate by use of encryption and decryption involving an algorithm."  Dkt. No. 151 at 18.

Nikon moves for summary judgment of non-infringement on the grounds that its products cannot infringe the asserted claims of the '847 patent because its products operate with an

████████████████████████████████████████████████████████

████████████████████████████████  Dkt. No. 191-8 at 4 (Nikon offers a Bluetooth specification information sheet explaining that ████████████████████████████████████

████████████████████).  Cellspin does not dispute that Nikon's accused products operate at the

██████████████████████; instead, it argues that "[w]hile every Bluetooth connection starts (and thus uses ██████████████████), the connection gets upgraded to higher levels of security as and when pairing is established between the two devices."  Dkt. No. 206 (Cellspin's Responsive Statement of Facts) at 5.  Cellspin cites to another section of the Bluetooth specification describing authentication procedures at other Bluetooth security levels.  *Id.* (citing Dkt. No. 191-8 at 4). Simply because a product runs a Bluetooth connection that can be "upgraded" to authenticate and encrypt does not rebut Nikon's evidence that its products operate a Bluetooth security mode that

████████████████████████████████.

Cellspin also offers the theory that the Nikon products' use of cryptographic keys necessarily implies that the products perform authentication.  Dkt. No. 190-7 (Vijh Expert Report)

---

[63] This is the same issue contested in *Under Armour*, *see supra* Section III.C.1.b, and *Fossil*, *see supra* Section III.D.2.a.

United States District Court
Northern District of California

¶ 56 ("Authentication is used in both Bluetooth LE Legacy Connection Pairing and Bluetooth LE Secure Connections Pairing, and both use cryptographic keys for authentication").  Cellspin supports this theory by citing to Nikon's technical source code, but does so without explanation. That is not enough.  *See Novartis Corp.*, 271 F.3d at 1051 ("Evidence from which a reasonable fact-finder could find infringement will forestall this possibility.  However, a party does not meet this evidentiary threshold merely by submitting the affidavit of an expert who opines that the accused device meets the claim limitations."); *see also Dynacore Holdings*, 363 F.3d at 1277-78 ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device").

In summary, Cellspin's evidence is premised on Vijh's unsubstantiated presumption that a Bluetooth connection's ability to use cryptographic keys means that the connection performs authentication and encryption.  However, it is not enough for Cellspin to cite to technical documents and summarily state that "Mr. Vijh examined the connections from all perspectives, including Bluetooth classic; both infringe."  Dkt. No. 204 at 16.  Cellspin offers no evidence that Nikon's accused products operate with cryptographic keys, much less that Nikon's accused products perform decryption involving an algorithm as required by the asserted claim limitations.

Nikon has presented unrebutted evidence that the accused products operate with a Bluetooth connection that does not perform the "encryption and decryption involving an algorithm" required by the Court's construction of the claims of the '847 patent.  Accordingly, Nikon's motion is granted as to this ground.

*          *          *

For the reasons above, Nikon's motion for summary judgment is granted.

United States District Court
Northern District of California

**IV.    CONCLUSION**

For the reasons set forth above, the Court rules as follows:

1.    Fitbit's motion is **GRANTED**.  In light of this ruling, the Court **DENIES AS MOOT** the motions to exclude certain expert testimony.  This order terminates Dkt. Nos. 277, 283, 289 in *Cellspin Soft, Inc. v. Fitbit LLC*, No. 4:17-CV-5928 (N.D. Cal.);

2.    Nike's motion is **GRANTED**.  In light of this ruling, the Court **DENIES AS MOOT** the motion to exclude certain expert testimony.  This order terminates Dkt. Nos. 198, 200 in *Cellspin Soft, Inc. v. Nike, Inc.*, No. 4:17-CV-5931 (N.D. Cal.);

3.    Under Armour's motion is **GRANTED**.  This order terminates Dkt. No. 170 in *Cellspin Soft, Inc. v. Under Armour, Inc.*, No. 4:17-CV-5932 (N.D. Cal.);

4.    Fossil's motion is **GRANTED**.  In light of this ruling, the Court **DENIES AS MOOT** the motion to exclude certain expert testimony.  This order terminates Dkt. Nos. 265, 276 in *Cellspin Soft, Inc. v. Fossil Group, Inc.*, No. 4:17-CV-5933 (N.D. Cal.);

5.    Garmin's motion is **GRANTED**.  This order terminates Dkt. No. 199 in *Cellspin Soft, Inc. v. Garmin International, Inc.*, No. 4:17-CV-5934 (N.D. Cal.);

6.    Nikon's motion is **GRANTED**.  In light of this ruling, the Court **DENIES AS MOOT** the motion to exclude certain expert testimony.  This order terminates Dkt. No. 191, 197 in *Cellspin Soft, Inc. v. Nikon Americas, Inc.*, No. 4:17-CV-5936 (N.D. Cal.).

//
//
//
//
//
//
//
//
//
//

1    The Court has conditionally filed this Order under seal because Section III.F contains

2    portions that may warrant continued sealing.  Accordingly, Cellspin and Nikon are **ORDERED** to

3    file a notice to the Court identifying by page and line the portions of that Order they believe

4    should be maintained under seal and including authority to support the same.  The parties' notice

5    shall be due within 3 days of the filing of this order.  The Court will issue a redacted version of the

6    Order upon considering the parties' notice.

7    After the filing of the redacted order, the Clerk shall enter judgment and terminate these

8    actions.

9    **IT IS SO ORDERED.**

10

11   Dated: June 7, 2022

12                                              _____
                                                **YVONNE GONZALEZ ROGERS**
                                                **UNITED STATES DISTRICT COURT JUDGE**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28